Opinion by
Mr. Justice Hall.
The parties appear here in the same order as in the trial court. We refer to them as Gardner and Mid-Continent.
Gardner filed its complaint on September 4, 1958, alleging for a FIRST CLAIM that Mid-Continent, effective as of July 1, 1957, requested it to haul coal from Mid-Continent’s mine to the railhead near Carbondale, and offered to pay therefor $3.00 per ton for the first 5,000 tons hauled per month, and $2.00 per ton for all in excess of 5,000 tons per month. That pursuant to this request, Gardner hauled coal through the month of May 1958, and that there is due and unpaid for said hauling the sum of $20,465.37, for coal hauled during the first five months of 1958. For a SECOND CLAIM Gardner alleges that Mid-Continent is indebted to it in the amount of $4,662.50 as rental for equipment for the month of March 1958.
Mid-Continent filed its answer and counterclaims alleging that all coal hauled was hauled as provided by a written contract entered into between the parties on August 10, 1956, and that all amounts due have been paid; alleges not only payment but overpayment for rental of equipment, and sets forth a first counterclaim *124 for (1) $9,969.47 overpayment on rental of equipment, and (2) a second counterclaim for $10,000.00 for breach of the contract of August 10, 1956, in failing to haul, for the period specified in the contract, the coal produced at its mine.
Trial was to a jury, to which forms of verdicts on all claims were submitted. The jury allowed the claim of Gardner for rental of equipment. All other claims and counterclaims were denied. Judgment was entered accordingly.
Gardner is here by writ of error seeking reversal as to the denial of its claim for $20,465.37 for hauling.
Mid-Continent assigns cross-error and seeks reversal of the judgment for $4,662.50 for equipment rental. It does not question the verdicts denying its counterclaims.
Prior to August 10, 1956, Mid-Continent had been engaged in extensive development work for the purpose of opening a coal mine in Pitkin County, Colorado, located several miles from the railroad shipping point near Carbondale.
Negotiations were entered into between the parties, looking to transportation of coal to be mined from the mine tipple to the railroad shipping point.
On August 10, 1956, the parties entered into a written “Coal Haulage Contract” whereby Gardner agreed to haul coal produced from the mine to the railhead at the agreed price of $2.00 per ton. Hauling was to commence when production started and was to continue for five years.
The contract specifically provided that Gardner should haul all of the coal produced from the mine. Mid-Continent did not expressly agree to mine any coal, to continue mining for the five year period, to offer any coal for hauling or that it would mine any definite quantity of coal during any stated period of time.
The contract did provide for increases or decreases in the price per ton for hauling in the event of 5 % increases or decreases in the wages paid by Gardner to its em *125 ployees, and also for increases or decreases in the price for hauling in the event of increases or decreases in the cost price of new trucks to be used in hauling.
The contract also provided for renegotiation of the basic price for hauling in the event of the happening of certain events and for arbitration of certain disputes.
Production began in October 1956 and Gardner hauled all coal produced during 1956 and 1957 and the first three months of 1958, and hauled part of the coal produced during April and May 1958.
Production during 1956 and the first six months of 1957 had not reached the 500 tons per day, or approximately 10,000 tons per month, anticipated by the parties at the time they executed the haulage contract. As a result of this short production, and at the request of Gardner, the parties met and Gardner complained of losses suffered by it on the coal hauling at $2.00 per ton, which Gardner claimed were primarily caused by the low production. As an outgrowth of this meeting, Mid-Continent sent to Gardner for each of the months July, August, September, October, November and December of 1957, two voucher-type checks. Attached to each check was a voucher, a part thereof being a “remittance advice” stating that: “Your endorsement of above check constitutes a receipt in full for account as stated below. No other receipt necessary. If incorrect, please return this voucher, without alteration, explaining differences.” The voucher portion of one of these monthly checks showed the month and year and number of tons hauled at $2.00 per ton and the total amount.
The other monthly check was for an amount equal to $1.00 per ton on the coal actually hauled during the month or for $5,000.00, whichever was the lesser amount. The voucher portion of this check contained the same “remittance advice” and stated: “Temporary bonus paid on trucking of coal for month of [month] 1957 only. This payment does not alter or affect terms of coal haulage contract in any way.”
*126 Gardner endorsed and cashed all of these checks and claims nothing for hauling done prior to 1958.
Gardner continued to haul in 1958. On January 31, 1958, Mid-Continent notified Gardner by letter that pursuant to the agreement reached at the August 1957 meeting, the temporary extra payments of $1.00 per ton had been completed with the payment on January 16, 1958, for coal hauled during December 1957. Gardner, on February 4, 1958, acknowledged receipt of the above letter and stated that at the meeting in August, when the dollar per ton extra was agreed upon, “there was no time limit mentioned.”
On February 17, 1958, and on about the 15th of each month thereafter, including June 1958, Mid-Continent sent to Gardner only one monthly check, with the aforementioned “remittance advice” attached, showing payment for the number of tons of coal hauled during the preceding month at $2.00 per ton. Gardner cashed all of these checks; however, on receipt of each it mailed statements to Mid-Continent for $1.00 per ton extra on the first 5,000 tons hauled. On receipt of these statements Mid-Continent promptly returned the same to Gardner with a letter stating: “We are returning the attached invoice as all coal trucking has been paid for in full in accordance with the terms of the contract.”
On or about May 15, 1958, all arrangements for future coal hauling between Mid-Continent and Gardner were terminated by mutual consent.
There is no dispute with reference to any fact essential to the determination of Gardner’s first claim except one. There is a sharp conflict in the testimony as to how long the $1.00 bonus per ton was to be paid. Only two persons were present at the meeting when this extra dollar was agreed upon — Harry I. Gardner, one of the plaintiffs, and L. S. Wood, president of Mid-Continent. Gardner testified that there was no time limit as to when the extra dollar per ton on the first 5,000 tons should expire, whereas Wood testified that it was agreed that it *127 should be retroactive to July 1, 1957, and terminate on January 1, 1958.
By its verdict in favor of Mid-Continent there can be no doubt that the jury accepted Mid-Continent’s contention with reference to this fact — really the only fact in dispute. It is not within the province of trial judges or this court to disturb such a finding, supported as this is by direct testimony and corroborated by the subsequent conduct of the parties.
Gardner, both in the trial court and here, vigorously contends that the “Coal Haulage Contract” executed by the parties on August 10, 1956, is void for lack of mutuality in that Mid-Continent did not (1) agree to employ Gardner to haul coal; (2) did not obligate itself to mine any definite or ascertainable amount of coal; (3) did not agree to operate for any fixed or ascertainable period of time. We find no merit in this contention for even if the contract were subject to the infirmity urged, it avails Gardner nothing, for throughout it relies on an alleged verbal contract made in August of 1957 and performance thereunder.
There was only one modification — the price per ton, and the only dispute is the duration of the increase then agreed upon. The jury’s finding on this disputed question is amply supported by testimony and the conduct of the parties. Even though we accept Gardner’s contention that the written contract is void and that the parties made a new and binding contract in August 1957, there is a conflict in the testimony as to the terms of that contract, and the jury having found that the $3.00 rate terminated on December 31, 1957, its finding cannot be disturbed.
Counsel for Gardner urge that it was error to admit the haulage contract in evidence for any purpose, contending it was void. Void or not void, it was properly admitted in evidence. Its existence and the operations conducted pursuant thereto from August 10, 1956, to July 1, 1957, furnish the background leading up to the *128 August 1957 meeting culminating in the alleged new arrangement on which Gardner bases its claim. Gardner repeatedly referred to the hauling contract prior to the agreement on the new rate, and complained of numerous alleged breaches thereof by Mid-Continent; e.g., failure to produce the quantity of coal contemplated, failure to supply the agreed storage bins, permitting the coal to become frozen making loading difficult, etc. Even as late as February 19, 1958, it requested a meeting with Mid-Continent: “* * * to renegotiate the terms of the agreement of August 10, 1956, between Mid-Continent and Coal Basin insofar as the ton rate to be paid Coal Basin is concerned.”
In order to understand what witnesses were talking about and to make meaningful documents referred to, it was necessary that the jury have before it this haulage contract which was constantly referred to by the witnesses and in letters and other documents in evidence. There was no error in its admission.
Gardner also urges as grounds for reversal the giving of Instruction No. 8-A:
“INSTRUCTION NO. 8-A.
“You are instructed that when a party makes an offer of a certain sum to settle a claim, when the sum in controversy is open and unliquidated, and attaches to his offer the condition that the same, if taken at all, must be received in full or in satisfaction of the claim in dispute, and the other party receives the money, he takes it subject to the condition attached to it, and it will operate as a full discharge of the claim even though the party receiving the money claims that it is only in part satisfaction of his debt.
“A claim is liquidated when the amount is fixed by law or has been ascertained and agreed upon by the parties; otherwise it is not.
“You are further instructed that, in the instant case, the law charges the plaintiffs with knowledge of the wording and contents of the checks received by them, *129 and with knowledge of the wording and contents of the vouchers or stubs attached thereto, when said checks were endorsed and cashed by them.”
The instruction is a correct statement of law and, contrary to counsel’s contention, there were facts before the jury which required that they be instructed as to the law applicable thereto.
On January 31, 1958, Mid-Continent by letter notified Gardner that payment was to be at the rate of $2.00 per ton. Gardner, on February 4, 1958, answered this letter stating that they were expecting the $1.00 per ton extra. Thus, it appears that the parties were in disagreement as to how much should be paid for coal hauled in January 1958 and subsequent months.
On February 17, 1958, Mid-Continent sent to Gardner its check for coal hauled during January 1958; the check was for $2.00 per ton, and attached thereto was a “remittance advice” in words as stated above. Gardner cashed the check and, on February 20, 1958, sent to Mid-Continent its invoice:
“Trucking coal for month of January 1958 — 5,000 tons at $1.00 per ton — $5,000.00.”
On February 27, 1958, Mid-Continent returned this invoice to Gardner with a letter stating:
“We are returning your invoice. Trucking for January has been paid as per terms of contract.”
The parties pursued this same ritual through June 20, 1958, when a check was issued for the final hauling during the month of May. Clearly the parties were in disagreement as to the amounts due for hauling.
It was entirely proper to instruct the jury as to the legal effect of issuing checks for an amount less than that claimed and the cashing of these checks with full knowledge of the conditions under which they were tendered.
In Colorado Co. v. Denver Club, 65 Colo. 418, 176 Pac. 494, it was said:
“The testimony contained in the record should be *130 viewed in the light most favorable to the party successful in the trial court, in this case the defendant. Sebold v. Rieger, 26 Colo. App. 209, 142 Pac. 201. Applying the rules above stated, we are of-the opinion that the evidence warrants the conclusion that the plaintiff accepted, retained and cashed the check in question with the knowledge that the same was tendered by the defendant on condition of being a payment in full of the account between the parties. This being true, the taking of the check was an acceptance by the plaintiff of the conditions on which it was offered, all of which constituted an accord and satisfaction, precluding the plaintiff from the right to recover anything more on the account. C.R.I. & P. Ry. Co. v. Mills, 18 Colo. App. 8, 69 Pac. 317; Berdell v. Bissell, 6 Colo. 162.”
See, also, Stanley-Thompson Co. v. Southern Co., 65 Colo. 587, 178 Pac. 577, wherein we said:
“The check was received, endorsed, and cashed, and the money obtained thereon was retained by the plaintiff. Neither the check nor the proceeds therefrom was ever returned or offered to be returned by plaintiff to defendant. It must be held, therefore, that the check was accepted on the conditions on which it was offered, and that its acceptance constituted an accord and satisfaction. Colorado Tent & Awning Co. v. Denver Country Club, Supra.”
See, also, Winter Cigar Co. v. Burman, 67 Colo. 487, 186 Pac. 285, wherein we find the following language particularly applicable to the facts in this case:
“The court submitted to the jury the question whether or not the checks thus marked, which had been indorsed and paid to the plaintiff, constituted full payment. The jury answered the question in the negative.
“The record shows by the plaintiffs own testimony that the account was in dispute and unliquidated. That being so, the acceptance of the checks was an accord and satisfaction.”
*131 Turning now to Mid-Continent’s cross-error assigned to the allowance of Gardner’s second claim, that for amounts due for equipment rental. We find a situation somewhat similar to that presented in the coal haulage matter, except the parties’ positions are reversed.
Prior to October 1957, Mid-Continent, by verbal agreement, was renting from Gardner and paying to it rental on an hourly basis for equipment used in maintaining the road over which coal was being hauled. Gardner claimed that in October 1957 it and Mid-Continent entered into a new agreement whereby Mid-Continent was to pay for use of three items of equipment on a monthly basis — $5,450.00 per month irrespective of the hours used. Mid-Continent at the trial denied making this new agreement.
Gardner billed Mid-Continent on the above mentioned monthly rental basis for the months of October, November and December 1957, and January, February and three quarters of the month of March 1958. Mid-Continent, without protest or objection, paid all of these bills except the bill for March, which bill was received by it in April. This bill Mid-Continent refused to pay, claiming that there was no agreement to pay a monthly rental, that previous bills on a monthly basis had been paid by mistake, and that on the basis of the originally agreed to hourly charges, which it contends was the only agreement, Gardner had been overpaid to the extent of $9,969.47. This alleged overpayment is made the basis of Mid-Continent’s first counterclaim.
Here we have another disagreement between the parties as to whether there was a change in the terms of payment from an hourly to a monthly basis. Mid-Continent having paid five invoices, wherein they were charged on a monthly rental basis, has measurably weakened its testimony that there was no agreement for monthly rentals.
The finding of the jury in favor of Gardner is amply *132 supported by the testimony and the conduct of the parties, and cannot be disturbed.
Finding no error in the proceedings the judgment is affirmed.
Mr. Justice Frantz and Mr. Justice McWilliams concur.