OPPEDAHL & LARSON, Plaintiff,

v.

NETWORK SOLUTIONS, INC., Defendant.

Nos. Civ.A. 97 N 1496, Civ.A. 97 N 2456.

United States District Court, D. Colorado.

April 16, 1998.

Carl Oppedahl, Oppedahl & Larson, Frisco, CO, for Plaintiff.

Kenneth W. Lund, Lawrence M. Zavadil, Holm Roberts & Owen, Denver, CO, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is a contract dispute. Plaintiff Oppedahl & Larson asserts five claims against Defendant Network Solutions, Inc. [hereinafter "NSI"], including (1) breach of contract of which Oppedahl & Larson is a third party beneficiary, (2) detrimental reliance, (3) breach of contract to which Oppedahl & Larson is a party, and (4) interference with prospective business relations.[1] Oppedahl &

1. Oppedahl & Larson withdraws its prospective interference claim. (Opp'n to NSI's Mot. for

Larson also seeks a declaratory judgment determining the legal relationship of the parties. The matter is before the court on (1) Oppedahl & Larson's "Motion for Summary Judgment" filed November 17, 1997, (2) NSI's "Motion to Consolidate" filed November 21, 1997, and (3) NSI's "Motion for Summary Judgment" filed November 25, 1997. Jurisdiction is based on 28 U.S.C.A. §§ .1331 and 1332 (West 1993 & Supp.1998).

## FACTS

Beginning April 1, 1993, NSI, pursuant to a Cooperative Agreement with the National Science Foundation ("NSF"), became the registrar of second-level domain names for the .com top-level domain on the Internet.[2] (Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed Nov. 25, 1997] [hereinafter "Def.'s Summ. J. Br."]; admitted at Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 1.) A domain name is essentially an electronic address at which Internet communications may be received. An example of a second-level domain name in the top-level .com domain is the "patents" in patents.com. (Id., Statement of Undisputed Material Facts ¶ 2; admitted at Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 2.)

From April 1, 1993, the effective date of the Cooperative Agreement, until September 1995, NSI provided second-level domain name registration services to the general public pursuant to an arrangement whereby the NSF paid NSI on the basis of a cost reimbursement plus fixed fee for registering domain names. (Id., Statement of Undisputed Material Facts ¶ 3; admitted at Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 3.) NSI received compensation in excess of $4,219,339 under the Cooperative Agreement. (Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 2 [filed Nov. 17, 1997] [hereinafter "Pl.'s Summ. J. Br."]; admitted at Def.'s Opp'n to Pl.'s Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 2 [filed Dec. 8, 1997] [hereinafter "Def.'s Resp."].) NSI is the only registrar for the .com domain. (Id., Statement of Undisputed Material Facts ¶ 3; admitted at Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 3.) The .com domain is intended for use by commercial entities, as opposed to, for example, government entities which use the .gov domain and educational institutions which use the .edu domain. (Id., Statement of Undisputed Material Facts ¶ 4; admitted at Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 4.)

Between April 1, 1993, and September 1995, persons who wanted to register second-level domain names with NSI had to request registration of the desired name and provide NSI with relevant technical and administrative information. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 4; admitted in pertinent part at Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 4.) When NSI began registering second-level domain names, it did so, free of charge to the registrant, on a first-come, first-served basis. (Pl.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 6; admitted at Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 6.) When NSI received a registration request, it determined whether the requested name had previously been registered. If someone else already held the registration for the requested name, NSI notified the potential regis-

---

Summ. J. at 22–23 [filed Dec. 18, 1997] [hereinafter "Pl.'s Resp."].) Accordingly, I do not consider NSI's motion for summary judgment with respect to this claim.

2. The NSF entered into the Cooperative Agreement with NSI pursuant to 31 U.S.C.A. § 6305 (West 1983). The statute provides that

[a]n executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—(1) the principal purpose of the relationship is to transfer a thing of value

to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

31 U.S.C.A. § 6305.

trant and invited an application for an alternative name. The potential registrant either submitted an available domain name—i.e., one that was not already registered by another party—or withdrew the application. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 5.) The process of domain name registration was and is done electronically and automatically, with limited human intervention. (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 5.) If the potential registrant submitted an available name and provided the requested technical and administrative information, NSI entered the requested name and the relevant information into the domain name database. (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 6.)

NSI contends that it did not require nor expect any thing of value or other consideration from the registrant in exchange for performing this name registration service. The NSF paid NSI to register the names on a cost plus fixed-fee basis. According to NSI, the registration application used during the period from April 1, 1993, until September 1995, "[was] purely an administrative form, devoid of any language indicating any expectation of a *quid pro quo.*" (*Id.*, Statement of Undisputed Material Facts ¶¶ 6–7; *admitted in pertinent part at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶¶ 6–7.) Oppedahl & Larson does not dispute the content of the registration form, but contends that NSI "received the benefit of having added one more customer to its customer base, which strength-ened its position in seeking permission from the NSF to charge annual fees and strengthened its position with respect to its initial public offering of stock." (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶¶ 6–7.)

On June 7, 1994, Oppedahl & Larson submitted to NSI, via the Internet, its application to register *patents.com.* Oppedahl & Larson applied, using the standard administrative form NSI used to accept name registrations during the period from April 1, 1993, until September 1995. On June 21, 1994, NSI registered Oppedahl & Larson's requested domain name. (*Id.*, Statement of Undisputed Material Facts ¶¶ 8–9; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶¶ 8–9; *see* Ex. H [Oppedahl & Larson's Application], Ex. I [Registration Confirmation from NSI to Oppedahl & Larson].) Oppedahl & Larson paid nothing to NSI to register the *patents.com* name. (*Id.*, Statement of Undisputed Material Facts ¶ 10; *admitted in pertinent part at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 10.) After Oppedahl & Larson registered *patents.com,* it began use thereof for electronic mail (e-mail) and as a web site providing information about intellectual property law to interested persons who visited the web site. (Pl.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 9; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 9.)[3]

NSI contends that, at the time Oppedahl & Larson registered *patents.com,* NSI did not have a dispute policy which would govern if a trademark owner claimed that a domain name assigned to a registrant violated the trademark owner's trademark rights.[4]

---

**3.** NSI contends that it lacks knowledge to admit or deny Oppedahl & Larson's assertion. Because NSI offers no evidence which brings Oppedahl & Larson's assertion into dispute, to the extent Oppedahl & Larson's assertion is supported by the record, I deem it admitted for purposes of this order.

**4.** Oppedahl & Larson further contends that "[a]ll domain name registrars have, by definition, some way of handling domain name disputes, so NSI certainly did have a dispute policy." (Pl.'s Resp., Resp. to NSI's Statement of Undisputed

Material Facts ¶ 10, Attach. [Oppedahl Aff. ¶ 11].) According to NSI, however, Oppedahl & Larson's assertion that all domain name registrars necessarily have a policy regarding domain name disputes "is incorrect as a matter of logic and as a matter of law." (Def.'s Reply, Reply Concerning Undisputed Facts ¶ 10.) Although the relevance of the dispute is not readily apparent, it appears that it may stem in part from a difference in the interpretation of the meaning of the word "policy." If policy means a formally adopted approach to handling disputes, then Oppedahl & Larson does appear to be incorrect, at

(Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 10, Ex. 1 [Graves Aff. ¶¶ 31–32].) Oppedahl & Larson claims that a public document, known as RFC 1591, was located on NSI's web site and set forth its dispute policy.[5] (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 10, Attach. [Oppedahl Aff. ¶ 11].) NSI explains that RFC 1591 is a public document, which, although it may have been available on NSI's web site, was not created by NSI.[6] (Def.'s Reply ¶ 10, Ex. 2 [Oppedahl Dep. at 119–20, 130].)

In July 1995, NSI adopted a Domain Name Dispute Policy [hereinafter "Dispute Policy"]. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶¶ 12–13; *admitted in pertinent part at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶¶ 12–13.) According to NSI, it adopted the Dispute Policy, with the NSF"s approval, to "provide for actions [NSI] may take when presented with *prima facie* evidence of trademark infringement as a result of the registration of a domain name." (*Id.*, Statement of Undisputed Material Facts ¶¶ 12–13, Ex. 1 [Graves Aff. ¶¶ 31–31], Ex. E [Dispute Policy of 7/95].) According to Oppedahl & Larson, the NSF did not approve retroactive application of the Dispute Policy to existing registrants. (Pl.'s Resp., Resp. to

NSI's Statement of Undisputed Material Facts ¶ 12, Attach. [Affirmation of Carl Oppedahl ¶ 8, Ex. E (letter from Leslie Crawford, Freedom of Information Act Officer for the NSF to Carl Oppedahl of 7/29/96 [attaching correspondence between NSI and the NSF discussing adoption of the Dispute Policy) ].) Examination of the record suggests that discussions between the NSF and NSI regarding adoption of the Dispute Policy did not specifically provide for or prohibit retroactive application of the Dispute Policy.[7]

As the parties agree, the Dispute Policy provides that, if an owner of a federally registered trademark provides to NSI a certified copy of its "valid and subsisting" federally registered trademark, and that trademark is identical to a registered domain name, then NSI may send a letter to the domain name registrant offering the registrant certain options. As one option, the registrant may provide NSI with a certified copy of its own trademark registration, in which event the registrant may continue to use the domain name until NSI receives a court order directing otherwise. Another option permits the registrant to transfer the domain name to the trademark owner. A third option allows the registrant to accept a new domain name, registered without cost, to

least as a matter of logic. If, however, policy means something less formal, then Oppedahl & Larson's assertion may have some merit, at least in a theoretical sense. That is, every domain name registrar would have some way of *reacting* to a domain name dispute, even if that reaction is to do nothing.

5. The evidence in the record indicates that RFC stands for request for comment. RFCs are authored by individuals. An informal consensus process which occurs within the Internet community may lead to the acceptance or rejection of an RFC. Many RFCs fail to achieve a consensus and are ignored, there are a "few dozen" RFCs which are followed. According to Oppedahl & Larson, RFC 1591 is one around which a consensus developed. (Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. 2 [Oppedahl Dep. at 119–20, 130] [filed Jan. 12, 1998] [hereinafter "Def.'s Reply"].)

6. RFC 1591 was authored by Jon Postel prior to the existence of the Cooperative Agreement between the NSF and NSI. Postel is not a NSI employee. Further, according to Oppedahl & Larson, NSI has not "contributed meaningfully

to any development of any RFCs." (Def.'s Reply, Ex. 2 [Oppedahl Dep. at 119–20, 130].)

7. On July 21, 1995, Donald Mitchell, Staff Associate in the NSF Division of Networking & Communications Research and Infrastructure, sent an e-mail message to John Chester, of the NSF General Counsel's Office, explaining the evolution of the Dispute Policy and seeking Chester's reaction. Chester responded that he found the Dispute Policy "unobjectionable." David Graves, NSI Director for Business Affairs, then corresponded with Mitchell regarding what type of further approval process, if any was required. Mitchell informed Graves that the "proposed changes in the Domain Name Registration Policy [Dispute Policy] are unobjectionable and we [the NSF] concur with your suggestion that the new policy be expeditiously implemented." (*See* Pl.'s Resp., Attach. [Affirmation of Carl Oppedahl], Ex. E [letter from Leslie Crawford, Freedom of Information Act Officer for the NSF to Oppedahl of 7/29/96, Attachs. (e-mail from Mitchell to Chester of 7/21/95; e-mail from Chester to Mitchell of 7/21/95; e-mail from Graves to Mitchell of 7/21/95; e-mail from Mitchell to Graves of 7/25/95) ].)

be used for ninety days in conjunction with the disputed domain name. After the expiration of the ninety-day period, the allegedly infringing domain name would be on "hold" status so that no one could use that domain name until resolution of the dispute between the domain name registrant and the trademark owner. ' Fourth, the registrant may refuse to transfer the domain name or choose a new name. In that event, the domain name is placed on "hold" status and no one is permitted to use the name. (*Id.*, Statement of Undisputed Material Facts ¶ 14; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 14.) NSI contends that registrants who hold allegedly infringing domain names "always have had and continue to have, the option of suing the trademark owner for declaratory judgment concerning their registration of the domain name." (*Id.*, Statement of Undisputed Material Facts ¶ 14, Ex. 1 [Graves Aff. ¶ 34].) Oppedahl & Larson disputes the ready availability to a registrant of the option of seeking a declaratory judgment. (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 14, Attach. [Affirmation of Carl Oppedahl ¶ 9], Ex. F [letter from John H. McCann III, Senior Counsel, Hasbro to Graves of 1/26/96 (discussing domain name *clue.com* which allegedly infringed Hasbro's federally registered trademark "clue") ].) [8] The original Dispute Policy provides, in pertinent part, that: "Applicant acknowledges and agrees that this [Dispute] Policy [ ] on the registration and use of Domain Names may change from time to time and that, upon thirty [ ] days posting on the Internet ..., NSI may modify or amend the terms of this [Dispute] Policy [ ]." (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 18; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 18.)

Oppedahl & Larson claims that the Dispute Policy "materially affected the rights of domain name registrants when compared to the policy embodied in RFC 1591." (Pl.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 11, Attach. [Aff. in Supp. of Mot. for Summ. J. ¶ 8 (hereinafter "Oppedahl Aff.") ].) Oppedahl & Larson also argues that NSI did not send notice of the July 1995 adoption of the Dispute Policy to existing domain name registrants. (*Id.*, Statement of Undisputed Material Facts ¶ 12, Attach. [Oppedahl Aff. ¶ 8].) NSI disputes Oppedahl & Larson's claim. It does not, however, offer evidence which suggests it sent notice to existing registrants. Rather, NSI offers evidence—an article written by Carl Oppedahl criticizing NSI's Dispute Policy—which indicates that Oppedahl & Larson *was aware* that NSI had adopted the Dispute Policy. (Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 12, Ex. 2 [Graves Resp. Aff. ¶ 7]; Ex. A [Carl Oppedahl, "Avoiding the Traps in the New Rules for Registering a Domain Name," *New York Law Journal*, Aug. 14, 1995, at 5].)

Subsequent revisions to the Dispute Policy have clarified the rights of a registrant to a certain extent. For example, a registrant may now avoid "hold" status if its domain name registration preceded the trademark owner's trademark registration. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 15; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 15.) NSI asserts that one of its primary considerations in adopting the Dispute Policy was the possibility that, if NSI did not place an allegedly infringing domain name on "hold" status upon a proper showing by a trademark owner, NSI could be liable for committing contributory infringement or dilution of the trademark. (*Id.*, Statement of Undisputed Material Facts

---

8. Oppedahl & Larson claims that, with respect to the *clue.com* domain name, "NSI found [Hasbro's letter] sufficient to justify cutting off the *clue.com* name ... but [the letter] would probably not have provided grounds for a declaratory judgment action." According to Oppedahl & Larson only a temporary restraining order prohibited NSI from cutting off the domain. (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 14, Attach. [Oppedahl Aff. ¶ 9].) Oppe-

dahl & Larson's allegation is not supported by the record. It is merely speculation as to what would or would not support a declaratory judgment action. Oppedahl & Larson has failed to offer evidence which suggests the Dispute Policy precludes a registrant from bringing a declaratory judgment action. Accordingly, because the record supports NSI's assertion regarding the availability of this option, I deem it admitted for purposes of this order.

¶ 16; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 16.) [9] As of the time NSI filed its motion for summary judgment, twenty-six plaintiffs have sued domain name holders for infringement and have included NSI as an alleged contributory infringer or diluter. (*Id.*, Statement of Undisputed Material Facts ¶ 17; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 17.)

During the winter of 1994–95, the NSF projected that registration services would grow to exceed its budget and concluded that the burden of the costs of domain name registration should be shifted from the Government to the Internet users. (*Id.*, Statement of Undisputed Material Facts ¶ 19; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 19.) Effective September 14, 1995, the NSF authorized NSI to begin collecting specified fees from both existing and new domain name registrants. This arrangement replaced the previous cost-plus-fixed-fee method by which the NSF paid NSI. (*Id.*, Statement of Undisputed Material Facts ¶ 20; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 20.) NSI announced by press release and on the Internet that, pursuant to the NSF's approval of a fee-for-registration-service model for domain name registration, new registrants would have to pay a $100 fee to register a domain name for the first two-year period, and a $50 annual fee thereafter for registration renewals. (*Id.*, Statement of Undisputed Material Facts ¶ 21; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 21.) NSI also announced that existing registrants, such as Oppedahl & Larson, would have to pay an annual renewal fee of $50 on the anniversary date of their original registration in order to renew their domain name. (*Id.*, Statement of Undisputed Material Facts ¶ 22; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed

Material Facts ¶ 22.) NSI's imposition of a fee-for-registration-scheme was the subject of articles in *The Washington Post, The New York Times, USA Today, The Wall Street Journal,* and *The Boston Globe.* (*Id.*, Statement of Undisputed Material Facts ¶ 23; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 23.)

On November 23, 1995, NSI implemented a revised Dispute Policy. (*Id.*, Statement of Undisputed Material Facts ¶ 24; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 24.) The revised Dispute Policy contained the following statement: "Applicant acknowledges and agrees that this [revised Dispute] Policy [ ] on the registration and use of Domain Names may change from time to time and, upon thirty [ ] days posting on the Internet ..., NSI may modify or amend the terms of this policy statement." (*Id.*, Statement of Undisputed Material Facts ¶ 24; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 24.)

On June 7, 1996, NSI sent Oppedahl & Larson an invoice for $50 for the renewal of the *patents.com* domain name for a third year, which would run from June 21, 1996, until June 21, 1997. (*Id.*, Statement of Undisputed Material Facts ¶ 25; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 25.) At the time Oppedahl & Larson received its invoice to renew *patents.com*, the Dispute Policy had been in effect for almost eleven months—instituted in July 1995, and revised in November 1995. (*Id.*, Statement of Undisputed Material Facts ¶ 26; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 26.) The 1996 NSI invoice to Oppedahl & Larson did not mention any of NSI's policies and did not state that the payment of the fee modified the terms and conditions under which the *patents.com* do-

---

**9.** Oppedahl & Larson neither admits nor denies NSI's allegation because it lacks knowledge as to the "true reasons" NSI adopted the Dispute Policy. (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 16.) It does, however, offer its opinion, based on legal precedent, of whether NSI *should have* been concerned about

contributory infringement or dilution liability and suggests that, regardless, the Dispute Policy fails to address such concerns. Oppedahl & Larson's assertions are not responsive to the fact asserted by NSI. Accordingly, to the extent NSI's claim is supported by the record, I deem it admitted for purposes of this order.

main name was registered. (Pl.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 15; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.) Oppedahl & Larson acknowledges that, at the time its renewed its registration for the June 21, 1996, to June 21, 1997, period, the Dispute Policy had been in effect since July 1995. Oppedahl & Larson contends, however, that the Dispute Policy applied only to domain names registered after July 1995.[10] (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 26.) On June 18, 1996, Oppedahl & Larson paid by check NSI's June 7, 1996, invoice. The registration renewal ran from June 21, 1996, until June 21, 1997. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 28; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 28.)

On September 9, 1996, NSI made further revisions to its Dispute Policy. (*Id.,* Statement of Undisputed Material Facts ¶ 29; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 29.) The revised Dispute Policy contained a statement indicating that the Dispute Policy may change from time to time and that such changes would be posted on the Internet and

would be binding on all registrants.[11] (*Id.,* Statement of Undisputed Material Facts ¶ 29; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 29.) NSI has not revised its Dispute Policy since September 9, 1996. (*Id.,* Statement of Undisputed Material Facts ¶ 30; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 30.)

On February 14, 1997, during the one-year term for which Oppedahl & Larson had paid, Oppedahl & Larson, via the Internet, modified its domain name record for *patents.com.* (*Id.,* Statement of Undisputed Material Facts ¶ 31; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 31.) NSI offers evidence of the electronic form used by Oppedahl & Larson to submit its modification, and the form provides, in pertinent part:

> "By applying for the Domain name and through the use or continued use of the Domain name, the applicant agrees to be bound by the terms of NSI's then current [Dispute Policy] which is available [on the Internet].... The applicant acknowledges and agrees that NSI may change the terms and conditions of the [Dispute] Poli-

---

**10.** Oppedahl was "intimately familiar with the Dispute Policy and has been a constant advocate for its abandonment." (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 27.) On May 27, 1996, just days before Oppedahl & Larson received its renewal notice for *patents.com,* Oppedahl published an article criticizing the NSI Dispute Policy. (*Id.,* Statement of Undisputed Material Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 27.) Oppedahl's article stated, in part:

> Until last July [i.e., July 1995], if you had an Internet domain name and wanted to minimize your risk of losing it, basically all you had to do was avoid infringing anybody's trademark.
> . . .
> If your domain name is in a two-letter country domain, U.S. for example, then this is still the case. But if your domain name is in one of the three-letter domains, such as [com] and [net], administered by [NSI] via the Internet Network Information Center (InterNIC), then it is important to know that your risk of losing your domain name changed drastically last July. At that time, InterNIC put into effect a trademark

domain policy.... The policy which was revised in November, leaves any [.com] or [.net] domain name owner subject to various new risks relating to loss of a domain name.

(Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 27 (quoting Carl Oppedahl, "Securing Your Domain Name Can Be Risky Business," *Network World,* May 27, 1996); *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 27.) Apparently the parties' dispute centers on the meaning of the word "applicant" versus "registrant." Oppedahl's article quoted above indicates some ambiguity as to his knowledge of whether the Dispute Policy applied to registrants existing as of July 1995. *Based on the conclusions below, however, I need not determine the meaning of "applicant" versus "registrant," nor is it necessary to determine whether Oppedahl & Larson's knowledge of the policy constituted agreement thereto.*

**11.** The September 9, 1996, Dispute Policy stated "Registrant acknowledges and agrees that these guidelines my change from time to time and that, upon thirty [ ] days posting on the Internet ..., [NSI] may modify or amend this [Dispute] Policy, and that such changes are binding upon Registrant." (Def.'s Summ. J. Br., Ex. G [Dispute Policy of 9/9/96].)

cy [ ] from time to time as provided in the [Dispute] Policy [ ]."

(*Id.*, Statement of Undisputed Material Facts ¶ 31, Ex. 1 [Graves Aff. ¶ 51], Ex. O [domain modification template from Oppedahl to hostmaster@internic.net of 2/14/97].) Although Oppedahl recalls modifying the *patents.com* administrative information via a "web site transaction," he has no recollection of using a template which included the above quoted language.[12] (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 31, Attach. [Affirmation of Carl Oppedahl ¶ 13].)

On May 21, 1997, NSI sent Oppedahl & Larson an invoice for $50 for the renewal of the *patents.com* domain name for a fourth year, which would run from June 21, 1997, to June 21, 1998. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 32; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 32.) The invoice states that "by this payment, Registrant reaffirms the terms and conditions of its agreement with [NSI], including the current [ ] Dispute Policy." (*Id.*, Statement of Undisputed Material Facts ¶ 32; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 32.) On May 27, 1997, Oppedahl & Larson sent a check for $50, but Oppedahl & Larson conditioned its tender of payment "with the understanding that [Oppedahl & Larson] do[es] not agree to NSI's ... Dispute Policy." (*Id.*, Statement of Undisputed Material Facts ¶ 33; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 33.)

Oppedahl & Larson contends that NSI received Oppedahl & Larson's May 27, 1997, letter and check on May 28, 1997, and that NSI accepted Oppedahl & Larson's payment by depositing the $50 check in NSI's account on or before May 30, 1997. (Pl.'s Summ. J. Br., Statement of Undisputed Material Facts ¶¶ 18–19, Attach. [Oppedahl Aff. ¶ 11].) NSI disputes Oppedahl & Larson's contentions. According to NSI, it uses an vendor, not related to NSI, to process domain name registration checks. The vendor, not NSI, receives checks and deposits them without considering the accompanying correspondence. The vendor then forwards a copy of the check and any accompanying paperwork to NSI for review. The vendor received Oppedahl & Larson's check and deposited it on May 30, 1997. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 34; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 34.)

On June 17, 1997, NSI declined to renew Oppedahl & Larson's registration "on terms and conditions other than those specified in [NSI's] current domain name template agreement" and NSI sent a check made out to Carl Oppedahl for $50 to refund the money tendered by Oppedahl & Larson. (*Id.*, Statement of Undisputed Material Facts ¶ 35; *admitted in pertinent part at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 35; Def.'s Reply, Reply Concerning Undisputed Facts ¶ 35.) Neither Oppedahl & Larson nor Oppedahl has cashed NSI's check. (Pl.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 22; *admitted at* Def.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 22 .) NSI also notified Oppedahl & Larson that, in order to avoid interruption of domain name service, Oppedahl & Larson must tender payment, subject to NSI's terms and conditions—i.e., the Dispute Policy—by July 17, 1997. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 35; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 35.)

According to NSI, no one has attempted to invoke the Dispute Policy against Oppedahl & Larson. That is, no party is claiming that Oppedahl & Larson's registration of the *patents.com* domain name violates their trademark rights. (*Id.*, Statement of Undisputed Material Facts ¶ 39; *admitted at* Pl.'s Resp.,

---

12. Oppedahl & Larson does not challenge the validity or authenticity of the domain change template modifying *patents.com*, and it offers no evidence which suggests that another form was used. Accordingly, I cannot conclude that Oppedahl's lack of memory regarding the contents of the form he used creates a disputed question of fact. I therefore deem admitted, for purposes of this order, that the language of the modification form regarding the effect of continued use of a domain name was present on the domain name modification form used by Oppedahl & Larson.

Resp. to NSI's Statement of Undisputed Material Facts ¶ 39.) NSI contends that Oppedahl & Larson "does not face any known risk that the *patents.com* domain name will be put on 'hold' status because of the terms and conditions of the [NSI] Dispute Policy." (*Id.,* Statement of Undisputed Material Facts ¶ 39.) Oppedahl & Larson disputes that it faces no known risk. (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 34.) It fails, however, to offer any evidence of a known risk—e.g., a party claiming infringement.

Approximately two hundred domain name registrars operate around the world. More than sixty of the two hundred register domain names from anywhere in the world. (Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 40; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 40.) NSI contends that (1) some of the sixty international registrars do not have dispute policies, and (2) any of sixty registrars could be used by Oppedahl & Larson. (*Id.,* Statement of Undisputed Material Facts ¶ 40, Ex. 1 [Graves Aff. ¶ 60], Ex. S [list of registrars which do not require a local address of a registrant].) Oppedahl & Larson denies that there are other registrars which it could use for its domain name *patents.com* because it "has developed valuable recognition and good will." (Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 40, Attach. [Affirmation of Carl Oppedahl ¶ 6].) With respect to whether other registrars do or do not have dispute policies, Oppedahl & Larson contends that, by definition, all registrars have a policy.[13] (*Id.,* Resp. to NSI's Statement of Undisputed Material Facts ¶ 40, Attach. [Affirmation of Carl Oppedahl ¶ 11].)

On July 1, 1997, Oppedahl & Larson commenced litigation in the District Court for Summit County, Colorado. (Notice of Removal, Ex. A [Compl. (filed July 1, 1997, in the District Court for Summit County, Colo.)] [filed July 11, 1997].) On July 8, 1997, prior to serving any documents on NSI and without notice to NSI, Oppedahl & Larson obtained a temporary restraining order to prevent NSI from discontinuing Oppedahl & Larson's *patents.com* registration. (*Id.,* Attach. [T.R.O. (filed July 8, 1997, in the District Court for Summit County, Colo.)]; *see also* Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 36; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 36.) On July 11, 1997, NSI removed the state case to this court. (*Id.; see also* Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 37; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 37.) On July 17, 1997, the parties stipulated that NSI would not discontinue or alter registration of Oppedahl & Larson's *patents.com* name until requested by Oppedahl & Larson or by further order of this court. (Mot. for Entry of Stipulated Order [filed July 17, 1997]; *see also* Def.'s Summ. J. Br., Statement of Undisputed Material Facts ¶ 37; *admitted at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 37.) NSI contends that it agreed to the stipulation to leave Oppedahl & Larson's domain name alone only to conserve judicial resources and not as an admission or concession as to the validity of Oppedahl & Larson's claims. (*Id.,* Statement of Undisputed Material Facts ¶ 37.) Although Oppedahl & Larson contends that NSI has threatened to cut off the *patents.com* name, NSI has not revoked Oppedahl & Larson's domain name or placed it on hold status. (*Id.,* Statement of Undisputed Material Facts ¶ 38; *admitted in pertinent part at* Pl.'s Resp., Resp. to NSI's Statement of Undisputed Material Facts ¶ 38.) On November 17, 1997, Oppedahl & Larson filed a motion for summary judgment. (Mot. for Summ. J. [filed Nov. 17, 1997].) On November 21, 1997, NSI filed a motion to consolidate this action with Civil Action No. 97 N 2456, *Carl Oppedahl v. Network Solutions, Inc.* (Mot. to Consolidate [filed Nov. 21, 1997].) On November 25, 1997, NSI filed a motion for summary judgment. (Mot. for Summ. J. [filed Nov. 25, 1997].)

## ANALYSIS

### 1. *Motion to Consolidate*

■ NSI has moved to consolidate this case with Civil Action No. 97 N 2456. Rule

---

**13.** This returns to the parties' semantic debate over the meaning of "policy."

42(a) of the Federal Rules of Civil Procedure provides that "[w]hen actions involving a common question of law or fact are pending before the court, ... it may order all the actions consolidated; and it may make such orders concerning the proceedings therein as may tend to avoid unnecessary costs or delay." Fed.R.Civ .P. 42(a); *see Central Motor Co. v. United States*, 583 F.2d 470, 488 (10th Cir.1978). The decision to consolidate is within the discretion of the court. *Shump v. Balka*, 574 F.2d 1341, 1344 (10th Cir.1978).

This case and 97 N 2456 share common parties and common questions of law and fact. The plaintiff in this action is the law firm of Oppedahl & Larson, of which Carl Oppedahl, the plaintiff in 97 N 2456, is a partner. Both Oppedahl & Larson and Oppedahl registered domain names with NSI, and both now seek to determine their legal relationships with NSI, in particular whether the Dispute Policy governs their relationships. The plaintiff in each case has asserted the same five claims for relief. Of course, there are factual distinctions, such as the domain name—*patents.com* versus *oppedahl.com*—and the timing of communications between the parties. In particular, in less than a month from the time NSI received Oppedahl & Larson's renewal of *patents.com* which rejected the Dispute Policy, NSI responded to Oppedahl & Larson. With respect to *oppedahl.com*, NSI and Oppedahl spent several months corresponding regarding whether NSI was in receipt of Oppedahl's registration fee. After approximately five months, NSI responded to Oppedahl that it would not accept his registration if he refused to agree to the Dispute Policy. Although Oppedahl resists consolidation by highlighting the difference in parties and facts, the similarities are substantial. Because of the overlap of parties, facts, claims, and legal issues, I conclude that consolidation is warranted. NSI's motion to consolidate is hereby granted.

## 2. Legal Standard for Summary Judgment

Under rule 56(c), the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in his or her pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Intl., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990] ).

## 3. Third Party Contract

■ Oppedahl & Larson claims that it is a third-party beneficiary to the Cooperative Agreement between the NSF and NSI. NSI contends, and Oppedahl & Larson does not dispute, that such a determination should be made in accordance with federal common law. (*See* Def.'s Summ. J. Br. at 14 n. 1 [citing *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1478–80]; Pl.'s Resp. at 9–12.) Although there are various considerations which determine whether federal common law or state law applies in a situation such as this, *see Anderson v. Eby*, 998 F.2d 858, 864 (10th Cir.1993) (recognizing that which law applies depends on whether "the federal gov-

ernment has an articulable interest in the outcome") (citation omitted), the parties here do not dispute its application. Accordingly, on this state of the record, I apply federal common law.

■ Whether a party is a third-party beneficiary of a contract, such that it is entitled to sue for breach of the terms thereof, depends on the language of the contract. The agreement must reflect the intent to benefit the third-party. *State of Mont. v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997). In *German Alliance Insurance Company v. Home Water Supply Company*, 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912), the Supreme Court held that "[b]efore a stranger [to a Government contract] can avail himself of the exceptional privilege of suing for breach of any agreement, to which he is not a party, he must at least show that it was intended for his direct benefit." *Id.* at 230, 33 S:Ct at 35. The Court concluded that, although each taxpayer has an interest in the contracts made by and with the Government and may receive an incidental benefit from the performance thereof, to permit a breach-of-contract action would "unduly extend contract liability, would introduce new parties with new rights, and would subject those contracting with [the Government] to suits by a multitude of persons ... which were not, and ... could not have been, in contemplation of the parties." *Id.* at 231, 33 S.Ct. at 35. The *Restatement (Second) of Contracts* § 313 (1981) [14] recognizes the special nature of Government contracts, stating that such contracts "often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." *Restatement (Second) of Contracts* § 313 cmt. a. "An individual who is not a party to a contract ... does not have a right to sue for breach of that contract merely because he would benefit from its performance." *Montana Bank of Circle, N.A. v. United States*, 7 Cl.Ct. 601, 611 (Cl.Ct.1985). In order to

permit a person to sue as a third party beneficiary, there must be not just "a desire or a purpose to confer a benefit on a third person, nor a desire to advance his interests. There must also be a showing of an intent that the promisor shall assume a direct obligation to the third party." *Id.*

■ The statute authorizing the Cooperative Agreement between the NSF and NSI offers no guidance as to the intent of the parties. *See* 31 U.S.C.A. § 6305. The statute establishing the functions of the NSF provides that it is authorized and directed to "foster and support the development and use of computer and other scientific and engineering methods and technologies, primarily for research and education in the sciences and engineering." 42 U.S.C.A. § 1862(a)(4) (West 1994). This statutory framework indicates that individual users, such as Oppedahl & Larson, are not the intended beneficiary of the NSF's endeavors. Most importantly, the court considers the language of the agreement itself. *See Slattery v. United States*, 35 Fed.Cl. 180, 185 (Fed.Cl.1996). The Cooperative Agreement does not contain either a clause specifically reflecting NSI's assumption of a direct obligation to domain name registrants or a clause specifically eliminating them as intended beneficiaries. The stated purpose of the agreement begins as follows:

During the past two decades *computer networks* have facilitated collaboration among members of many research and education communities and provided them with remote access to information and computing resources. These *networks* have continued to grow both in the number of users and in the capabilities provided to the individual users. It is anticipated that such *networks* will become essential to research and education during this decade. In particular, the collection of interconnected networks known as the Internet has become important for may research communities. It is

**14.** The section reads, in pertinent part, that
a promisor who contracts with a government or a governmental agency to do an act or render a service is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless (a) the terms of the

promise provide for such liability; or (b) the promisee is subject to liability to the member of the public for damages and a direct action is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for the breach. *Restatement (Second) of Contracts* § 313.

also of increasing importance for education.

(Def.'s Summ. J. Br., Ex. A [Cooperative Agreement Article I (emphasis supplied) ].) The subject of each sentence of the first paragraph is computer networks, not specific users or even individual users in general. To be sure, the Cooperative Agreement recognizes that individuals comprise and use the networks and therefore that NSI and others working on the project "work closely together to provide a seamless interface for users in need of services." (*Id.*, Ex. A [Cooperative Agreement Article I].) Other provisions of the Cooperative Agreement discuss the registration services to be provided by NSI and in conjunction therewith discuss the needs of the networking community. (*See id.*, Ex. A [Cooperative Agreement Articles II, III].) Although individual registrants are necessarily the users of the registration service provided by NSI under the Cooperative Agreement, the language of the agreement does not indicate that individual registrants were intended beneficiaries. The agreement is for the development and management of computer networks, and the registration of user domain names is a critical component of such a project. Registrants are akin to users of any other public works project. *See German Alliance Ins. Co.*, 226 U.S. at 231, 33 S.Ct. at 35. The language of the Cooperative Agreement, while recognizing that registrants would benefit from the Cooperative Agreement, does not indicate that NSI adopted a direct obligation to individual registrants as third parties. I conclude that Oppedahl & Larson is not a intended third-party beneficiary of the Cooperative Agreement, and is, therefore, not entitled to sue for breach of that agreement. NSI is entitled to summary judgment on Oppedahl & Larson's third-party-beneficiary claim. Oppedahl & Larson's motion for summary judgment with respect to this claim is denied. I need not address the parties' arguments regarding breach of the Cooperative Agreement.

### 4. Detrimental Reliance

Oppedahl & Larson's second claim is for detrimental reliance on the Cooperative Agreement. Oppedahl & Larson contends that, by entering into the Cooperative Agreement, NSI "made an implied promise to the registrants of ... domain names ... not to arbitrarily interfere with registrants' continued use of their domain names." (Notice of Removal, Attach. [Compl. ¶ 26].) Although Oppedahl & Larson does not specifically allege breach of this alleged implied promise, it does suggest that the Dispute Policy is a breach thereof. (*Id.*, Attach. [Compl. ¶ 28].)

NSI argues that Virginia law applies. (Def.'s Summ. J. Br. at 22 n. 7) Oppedahl & Larson contends that New York law applies. (Pl.'s Resp. at 23.) The parties agree that Colorado's choice of law principles govern. (Def.'s Summ. J. Br. at 22 n. 7; Pl.'s Resp. at 23.) Indeed, a court sitting in diversity applies the choice of law considerations which would be applied by the state courts of that jurisdiction. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Colorado has adopted the "most significant relationship test" for contract and promissory estoppel actions. *Zimmerman v. Board of Publications of the Christian Reformed Church, Inc.*, 598 F.Supp. 1002, 1007–08 (D.Colo. 1984); *Wood Bros., Homes, Inc., v. Walker Adjustment Bureau*, 198 Colo. 444, 601 P.2d 1369, 1372–73 (1979) (en banc). In particular, with reference to service contracts, Colorado applies the *Restatement (Second) of Conflict of Laws* § 196 (1971). *Wood Bros. Homes, Inc.*, 601 P.2d at 1372–73. Section 196 provides that the law which governs the dispute, in the absence of a contractual choice of law, is:

> the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in section 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Restatement (Second) of Conflicts of Laws* § 196.

NSI is located in Virginia. (*See* Def.'s Summ. J. Br., Ex. 1 [Graves Aff, ¶ 3], Ex. A [Cooperative Agreement].) Oppedahl &

Larson argues, however, that NSI performs domain name registration services in places other than Virginia. (Pl.'s Resp. at 24.) According to Oppedahl & Larson, in order for a domain name to be useful, that name must be translated into a number, known as an IP address. Oppedahl & Larson further contends that NSI performs this translation by placing a database on nine root servers around the country. (*Id.*) NSI offers evidence which suggests, however, that the information which must be placed on the domain servers is done by domain server operators who have no contractual relationship with NSI to perform such a function and do so voluntarily, without funding from NSI. (Def.'s Reply at 9–10, Ex. 1 [Graves Supplemental Aff. ¶¶ 3–5].) Thus, although the results of domain name registrations are implemented and used in places other than Virginia, the act of registering second level domain names, the function for which the NSF contracted with NSI, occurs in Virginia. Because NSI renders its registration service in Virginia, Virginia law controls. Virginia law does not recognize a claim for promissory estoppel. *W.J. Schafer Assocs., Inc. v. Cordant, Inc.,* 493 S.E.2d 512, 516 (Va.1997); ·*Virginia Sch. of the Arts, Inc. v. Eichelbaum,* 493 S.E.2d 510, 512 (Va.1997). Accordingly, NSI is entitled to summary judgment on that claim. Oppedahl & Larson's motion for summary judgment is denied with respect to its second claim.

### 5. Breach of Contract

#### a. Claim of Contract in 1994

■ Formation of a contract requires offer, acceptance, and consideration. *Virginia Sch. of the Arts, Inc.,* 493 S.E.2d at 512. Consideration may be in the form of a benefit to the promisor or a detriment to the promisee. *Law v. Law,* 922 F.Supp. 1106, 1112 (E.D.Va.1996) (citing *Sager v. Basham,* 401 S.E.2d 676, 677 (Va. 1991)). Oppedahl & Larson contends that it has a contract with NSI which was formed in 1994 when NSI

offered to register domain names, and Oppedahl & Larson accepted. Oppedahl & Larson argues that consideration was in the form of (1) money from the NSF, and (2) inducement of performance on the part of Oppedahl & Larson in obtaining and paying for domain name service from a third party provider in order for NSI to register the domain name. (Pl.'s Resp. at 17.) NSI claims that no contract was formed in 1994 because there was (1) no assent to be bound on the part of NSI, (2) no consideration, and (3) vague and indefinite terms.

I conclude that no agreement was formed in 1994 because there was no consideration. Funding to NSI under the Cooperative Agreement was on a fixed fee arrangement; the NSF provided no consideration to NSI for registering Oppedahl & Larson's *patents.com* domain name. Oppedahl & Larson's claim that consideration may also be found in the fact that obtained domain name service from a third party provider also fails. Consideration may exist if "the promisee is induced by the [promisor] to do something that [it] is not legally bound to do or refrains from doing anything he has a legal right to do, or if the promisee acts in reliance upon the [promise] to his detriment." *See United Masonry Inc. of Va. v. Riggs Nat'l Bank of Wash., D.C.,* 233 Va. 476, 357 S.E.2d 509, 513–14 (internal citation omitted). Oppedahl & Larson contends that consideration may also be found "because to accept the offer [from NSI] and register a domain name[,] Oppedahl & Larson had to obtain and pay for domain name service from a third party provider." (Pl.'s Resp. at 17.) Oppedahl & Larson has offered no evidence, however, to substantiate the substance or timing of its arrangement which it allegedly undertook in order to register its domain name. There is insufficient evidence to determine whether Oppedahl & Larson incurred this obligation prior to or as a result of the offer by NSI to register Oppedahl & Larson's domain name.[15] For example, had Oppedahl & Lar-

---

15. The evidence suggests that Oppedahl & Larson had already incurred the obligation prior to applying for registration of its domain name. The domain name registration form indicates that applicants must "provide at least two independent servers on Government-sponsored networks that provide the domain service for translating names to addresses for hosts in this domain." (Def.'s Summ. J. Br., Ex. B [Domain Registration Form ¶ 7].) Oppedahl & Larson's

son already made such arrangements *prior* to the time it submitted *patents.com* for registration, it would be past consideration, insufficient to support a present promise. *Sager*, 401 S.E.2d at 677; E. Allan Farnsworth, *Contracts* § 2.7, at 52–54 (2d ed.1990). Because I conclude that consideration was lacking with respect to the alleged 1994 agreement, I do not address the parties' other arguments. NSI's motion for summary judgment is granted with respect to Oppedahl & Larson's claim of breach of the parties' 1994 agreement, and Oppedahl & Larson's motion for summary judgment with respect to this claim is denied. Because I conclude that NSI and Oppedahl & Larson did not have a contract based on Oppedahl & Larson's 1994 registration of *patents.com*, NSI's adoption of the Dispute Policy did not breach nor change the material terms of an agreement, for none existed.

### b. Claim of Contract and Modification in 1996

Effective September 14, 1995, NSI began to charge new registrants a domain name registration fee, and existing registrants would be required to pay an annual renewal fee of $50 per year, due on the anniversary date of their original registration. On June 7, 1996, NSI sent Oppedahl & Larson an invoice for $50 to renew the *patents .com* domain name. On June 18, 1996, Oppedahl & Larson paid NSI $50 for the renewal of its domain name. The parties appear to agree that a contract existed between NSI and Oppedahl & Larson at this point. What is in dispute, however, is whether the Dispute Policy applied to Oppedahl & Larson. NSI contends that Oppedahl & Larson was aware of the Dispute Policy, which had been in effect since July 1995, and thus was bound by its terms. Oppedahl & Larson contends that it was not bound by the Dispute Policy because (1) the June 7, 1996, renewal invoice did not reference the Dispute Policy, and (2)

the Dispute Policy did not, by its terms, apply to existing registrants.

In February 1997, Oppedahl & Larson modified its registration. The form on which it made the modification stated "[b]y applying for the Domain name and through the use *or continued use of the Domain name*, the applicant agrees to be bound by the terms of NSI's then current [Dispute Policy]." (Def.'s Summ. J. Br., Ex. O [domain modification template from Oppedahl to hostmaster @internic.net of 2/14/97].) According to NSI, Oppedahl & Larson, by modifying its domain name registration using a form which clearly indicated the applicability of the Dispute Policy to new and continuing registrants, agreed to be bound to the Dispute Policy.

The court need not determine whether Oppedahl & Larson was bound by the Dispute Policy in 1996.[16] Of course a court, faced with a missing term which is essential to a determination of the parties' rights and duties, may supply a term which is reasonable under the circumstances. *Restatement (Second) of Contracts* § 204, Farnsworth, § 7.16, at 546. In this situation, however, during the June 21, 1996, to June 21, 1997, registration term, no dispute over the *patents.com* domain name arose. Thus, there is no need for the court to determine how such a dispute would have been governed. Although the contentious nature of the parties' briefs suggests that they would welcome a judicial blessing over the righteousness of their respective positions, it is not the court's role to sit in judgment over irrelevant matters.

### c. 1997 Agreement

On May 21, 1997, NSI sent Oppedahl & Larson an invoice for $50 for the renewal of *patents.com* for the period from June 21, 1997, to June 21, 1998. The invoice states that "by this payment, Registrant reaffirms the terms and conditions of its agreement

---

application lists two server hostnames and two server Netaddresses, (*id.*, Ex. I [Oppedahl & Larson's Domain Registration Form]), which suggests that Oppedahl & Larson had already "incurred the detriment" of obtaining and paying for third-party server assistance prior to the time it submitted its registration form.

16. *If* the court had found a contract in 1994, then the terms of the 1996 renewal and whether any modification thereof occurred would be germane.

with [NSI], including the current [ ] Dispute Policy." (Def.'s Summ. J. Br., Ex. Q [Domain Registration/Renewal Invoice of 5/21/97].) On May 27, 1997, Oppedahl & Larson sent a check for $50 along with a letter which stated "[k]indly receive the enclosed check number 2360 in the amount of $50 in payment of the NSI annual fee, with the understanding that we do not agree to NSI's . . . Dispute Policy." Oppedahl & Larson made no notation on the check itself. (Pl.'s Summ.J. Br., Ex. 5 [canceled check for $50 from Oppedahl & Larson to NSI of 5/27/97].) The check was deposited for NSI by a third-party hired to process registration payments received by NSI. On June 17, 1997, NSI responded to Oppedahl & Larson's letter by (1) tendering a check to Oppedahl for $50 and (2) stating that it "declined to renew [patents.com ] on terms other than those specified in [NSI's] [Dispute Policy]." (Def.'s Summ. J. Br., Ex. R [letter from Graves to Oppedahl of 6/17/97].) The check from NSI remains uncashed.

The parties dispute the status of their relationship following the above transactions. According to Oppedahl & Larson, when it tendered its $50 check along with a letter expressly refusing to be bound by the Dispute Policy, it made a counteroffer. (Pl.'s Summ. J. Br. at 6.) In Oppedahl & Larson's analysis, the offer was the invoice sent by NSI expressly requiring that renewals agree to be bound by the Dispute Policy. When NSI deposited Oppedahl & Larson's $50 check, it agreed to Oppedahl & Larson's counteroffer.

NSI contends that because an outside vendor cashed the check on behalf of NSI and then forwarded Oppedahl & Larson's correspondence to NSI, NSI cannot be bound to accept Oppedahl & Larson's counteroffer merely by accepting payment. (Def.'s Resp. at 10–11.) According to NSI, as soon as it became aware of Oppedahl & Larson's refusal to be bound to the Dispute Policy, it tendered a refund check for $50 and wrote a letter rejecting Oppedahl & Larson's tender of payment conditioned as it was. NSI required that Oppedahl & Larson agree to the Dispute Policy or relinquish its domain name.

Regardless of whether Oppedahl & Larson was bound by the Dispute Policy from the time of its adoption, the time of the 1996 renewal, or the time of the February 1997 address change, I conclude that the 1997 renewal was a new offer by NSI to register patents.com for a year. That offer included the Dispute Policy as a term of the offer, just as it included the duration (one year) and the price ($50). Contrary to the suggestion of the parties, the 1997 invoice was not a modification of an existing contract. (See Def.'s Summ. J. Br. at 9–10; Pl.'s Resp. at 20; Pl.'s Summ. J. Br. at 6.) Oppedahl & Larson's tender of a $50 check with a letter expressly rejecting the Dispute Policy constituted a counteroffer. See Byrum v. Bear Invest. Co., 936 F.2d 173, 175 (4th Cir.1991) (citing Chittum v. Potter 219 S.E.2d 859, 864 (Va. 1975)); Arnold v. Amoco Oil Co., 872 F.Supp. 1493, 1502 (W.D.Va.1995) ("Traditional contract doctrine requires that the offeree's commitment be one on the terms proposed by the offer with no variation. An attempt to add to or change the terms of the offer turns the offeree's response from an acceptance into a counteroffer and a rejection of the offer."). Thus, the question before the court is whether NSI, by cashing Oppedahl & Larson's $50 check, agreed to Oppedahl & Larson's counteroffer, which expressly rejected the Dispute Policy.

▉ Virginia law provides that acceptance of an offer may be given in express words, or it may be inferred from the acts and conduct of the offeree. Durham v. National Pool Equip. Co. of Va., 205 Va. 441, 138 S.E.2d 55, 58 (1964) (citing Bernstein v. Bord, 132 S.E. 698, 699 (Va. 1926).) Further, to be effective, acceptance must be communicated to the one making the offer. Piland Corp. v. REA Constr. Co., 672 F.Supp. 244, 246 (E.D.Va.1987). Acceptance may be communicated in various ways, provided the alleged acceptance objectively can be interpreted as constituting acceptance of the offer. In re Frye, 216 B.R. 166, 171 (E.D.Va. 1997). Virginia has not specifically addressed the question of whether cashing a check constitutes acceptance.

▉ Various courts have concluded that such an action constitutes acceptance. See

*Gardner v. Mid–Continent Coal and Coke Co.*, 149 Colo. 122, 368 P.2d 204, 208 (1962) (finding that cashing of checks with full knowledge of conditions constituted acceptance); *Crouch v. Marrs*, 199 Kan. 387, 430 P.2d 204, 209 (1967) (holding that cashing of check constitutes acceptance, even when followed by refund check and rejection notice); *Rosenberg v. Townsend, Rosenberg & Young, Inc.*, 376 N.W.2d 434, 437 (Minn.Ct.App.1985) (concluding that acceptance of offer resulted from retaining check for eighteen months without notifying party that it would not be accepted as payment in full); *Bestor v. American Nat'l Stores, Inc.*, 691 S.W.2d 384, 389 (Mo.Ct.App.1985) (finding that plaintiff's retention of cashier's check for eight years and cashing of subsequent checks constituted acceptance); *Hoffman v. Ralston Purina Co.*, 86 Wis.2d 445, 273 N.W.2d 214, 218–19 (1979) (holding check for seven months without communicating rejection of offer was an unreasonable length of time and constitutes acceptance); *cf. Nu–Air Mfg. Co. v. Frank B. Hall & Co. of N.Y.*, 822 F.2d 987, 993 (11th Cir.1987) (stating that retention of past due insurance premiums was inconsistent with assertion that insured had forfeited insurance policy). Other courts have rejected the notion that retention or cashing of a check necessarily constitutes acceptance. *Houston Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1187–88 (5th Cir.1981) (concluding that cashing of check, without notice of such act or other notice of acceptance, does not constitute acceptance); *Empire Mach. Co. v. Litton Bus. Tel. Sys.*, 115 Ariz. 568, 566 P.2d 1044, 1050 (Ct.App. 1977) (finding that mere cashing of check does not constitute acceptance, but cashing of check and retention of proceeds over several months creates issue of fact as to accep-

tance); *Hermes v. William F. Meyer Co.*, 65 Ill.App.3d 745, 22 Ill.Dec. 451, 382 N.E.2d 841, 846–47 (1978) (stating that facts did not support conclusion that retention of check indicated assent); *see also Rockwood Mfg. Corp. v. AMP, Inc.*, 806 F.2d 142, (7th Cir. 1986) (collecting cases and concluding that Indiana had not resolved the issue); *cf. Stanley–Thompson Liquor Co. v. Southern Colo. Mercantile Co.*, 65 Colo. 587, 178 P. 577, 579 (suggesting that return of funds could suggest that acceptance had not occurred); *Karsch v. Carr*, 807 S.W.2d 96, 99 (Mo.Ct.App.1990) (holding that two-week retention of documents related to land purchase, including general warranty deed, deed of trust, promissory note, and title insurance commitment, did not constitute acceptance).

The cases cited above lead the court to conclude that whether NSI's cashing of Oppedahl & Larson's check followed by NSI's letter to Oppedahl & Larson, rejecting the terms of Oppedahl & Larson's counteroffer and providing a refund check of $50, is a question of fact unresolvable on summary judgment. Only *Crouch* concludes that cashing of a check, even when followed by an express rejection and a refund check, is sufficient to bind the party cashing the check to the contract. The other cases, both those which support the cashing or retention as acceptance rule and those that reject it, indicate that whether such an act constitutes an acceptance is a question of fact which may turn on consideration of factors which include, but are not limited to, the length of time the check was held, whether the funds were returned or retained, the time between receipt of the check and the rejection of the counteroffer, the authority of the "vendor" accepting checks for NSI,[17] and the information available to both offeror and offeree

---

17. NSI contends that the check was cashed by a third-party vendor without authority to bind NSI; the record, however, contains evidence insufficient to make such a determination. NSI describes the check acceptance process by explaining its use of a "vendor." (Def.'s Summ. J. Br., Ex. 1 [Graves Aff. ¶ 54].) From the conclusion it urges the court to reach, it appears that NSI believes the word "vendor" indicates that the entity responsible for handling NSI's checks did not have authority to bind NSI. The word "vendor" has no independent legal meaning. NSI supplements its assertion by stating in concluso-

ry fashion that "the outside vendor that processed Oppedahl & Larson's check ... did not and does not now, possess authority to accept, on [NSI's] behalf, any offers, counter[ ]offers, or proposed modifications to [NSI's] [Dispute Policy]." (Def.'s Opp'n to Pl.'s Mot. for Summ. J., Ex. 2 [Graves Aff. in Opp'n ¶ 11].) Given the numerous questions of fact related to the acceptance of the check and later rejection, however, I cannot conclude that NSI's assertion regarding the status of its check processor resolves the matter.

regarding the alleged acceptance. *Cf John Grier Constr. Co. v. Jones Welding and Repair, Inc.*, 238 Va. 270, 383 S.E.2d 719, 721 (1989) (stating that, in the context of accord and satisfaction, acceptance of a check tendered as full payment does not result in closing the account "unless it was accepted with intelligent appreciation of its possible consequences, coupled with knowledge of all relevant facts.")

This conclusion is in accord with the established law of Virginia which permits acceptance to be inferred from the acts and conduct of the offeree and requires that acceptance be objectively ascertainable and communicated to the offeree. *See Piland Corp.*, 672 F.Supp. at 246; *In re Frye*, 216 B.R. at 171; *Durham*, 138 S.E.2d at 58. Accordingly, NSI's and Oppedahl & Larson's motions for summary judgment with respect to Oppedahl & Larson's breach of contract claim are denied.

**6. Declaratory Judgment**

 A declaratory judgment action requires a case of actual controversy. 28 U.S.C.A. § 2201 (West 1994). Declaratory judgment is not proper where a court would render an advisory opinion on a hypothetical state of facts. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 965 (10th Cir.1996); *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir.1994). "It is well established that what makes a declaratory judgment action 'a proper judicial resolution of a "case or controversy" rather than an advisory opinion is [ ] the settling of some dispute which affects the behavior of the defendant toward the plaintiff.' " *Cox*, 43 F.3d at 1348 (quoting *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S.Ct. 2672, 2676 (1987)). It is not sufficient for a plaintiff to allege a subjective apprehension of future injury. Rather, a plaintiff must have an objectively reasonable apprehension of harm. *Cf. Cardtoons, L.C*, 95 F.3d at 965 (discussing the requirements for declaratory judgment in an intellectual property case); *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 882 (Fed.Cir.1985) (same).

 Oppedahl & Larson seeks a declaration of the parties' legal relationship, in particular whether the Dispute Policy (or some other means of resolving domain name disputes) is a term of their contract. Because the court cannot resolve on summary judgment the status of the parties contractual relationship, it is also not possible to resolve Oppedahl & Larson's declaratory judgment claim. If it is ultimately found that NSI rejected Oppedahl & Larson's counteroffer, then no contract exists. If it is ultimately found that NSI accepted Oppedahl & Larson's counteroffer, then Oppedahl & Larson will not be governed by the Dispute Policy for the June 21, 1997, to June 21, 1998, term. Such a result would not resolve, however, how disputes regarding *patents.com* would be addressed under such a contract. When a court determines that the parties have not agreed to a contract term which would govern in the dispute before it, the court may imply a term. *See Perry Eng'g Co. v. AT & T Communications, Inc.*, 998 F.2d 1010, No. 92–2050, 1993 WL 264461, at *2 (4th Cir. July 13, 1993); *Restatement (Second) of Contracts* § 204; Farnsworth, § 7.16, at 546. There is, however, no present dispute regarding the *patents.com* name. A court need not supply a missing contract term without a dispute which requires it. Oppedahl & Larson's declaratory judgment claim, in absence of an actual controversy, does not constitute a dispute between the parties which requires resolution. Accordingly, NSI's motion for summary judgment with respect to this claim is granted, and Oppedahl & Larson's motion for summary judgment is denied.

**7. Conclusion**

Based on the foregoing, it is therefore

ORDERED as follows:

1. NSI's motion for summary judgment is GRANTED in part and DENIED in part.

2. It is GRANTED with respect to Oppedahl & Larson's third-party beneficiary claim, detrimental reliance claim, and declaratory judgment claim. Those claims are hereby DISMISSED.

3. It is DENIED in all other respects.

4. Oppedahl & Larson's motion for summary judgment is DENIED.

5. This case and Civil Action No. 97 N 2456 are hereby CONSOLIDATED for all purposes.