Gary KREMEN, an individual, Plaintiff–Appellant,

and

Online Classifieds, Inc., a Delaware Company, Plaintiff,

v.

Stephen Michael COHEN, an individual; Ocean Fund International, Ltd., a foreign company; Sand Man Internacional Ltd., a foreign company; Sporting Houses Management Corporation, a Nevada company; Sporting Houses of America, a Nevada company; Sporting Houses General Inc., a Nevada company; William Douglas, Sir, an individual; VP Bank (BVI) Limited, a foreign company; Andrew Keuls, an individual; Montano Properties LLC, a California Limited Liability Company; Ynata Ltd., Defendant,

and

Network Solutions, Inc., a Delaware company, Defendant–Appellee.

No. 01–15899.

United States Court of Appeals, Ninth Circuit.

Argued Aug. 13, 2002.

Submitted July 25, 2003.

James M. Wagstaffe, Kerr & Wagstaffe LLP, San Francisco, CA, argued for the appellant. Pamela Urueta and Alex K. Grab joined him on the briefs.

Kathryn E. Karcher, Gray Cary Ware & Freidenrich LLP, San Diego, CA, argued for the appellee. David Henry Dolkas and Mira A. Macias joined her on the briefs.

Professor Brian E. Gray, San Francisco, CA, amicus curiae in support of the appellant.

William H. Bode, Bode & Grenier, Washington, D.C., for amicus curiae American Internet Registrants Association in support of the appellant.

Robin D. Gross, Electronic Frontier Foundation, San Francisco, CA, amicus curiae in support of the appellant.

Before: KOZINSKI and McKEOWN, Circuit Judges, and FITZGERALD,** District Judge.

· KOZINSKI, Circuit Judge.

We decide whether Network Solutions may be liable for giving away a registrant's domain name on the basis of a forged letter.

## Background

"Sex on the Internet?," they all said. "*That*'ll never make any money." But computer-geek-turned-entrepreneur Gary Kremen knew an opportunity when he saw it. The year was 1994; domain names were free for the asking, and it would be several years yet before Henry Blodget and hordes of eager NASDAQ day traders would turn the Internet into the Dutch tulip craze of our times. With a quick e-mail to the domain name registrar Network Solutions, Kremen became the proud owner of sex.com. He registered the name to his business, Online Classifieds, and listed himself as the contact.[1]

Con man Stephen Cohen, meanwhile, was doing time for impersonating a bankruptcy lawyer. He, too, saw the potential of the domain name. Kremen had gotten it first, but that was only a minor impediment for a man of Cohen's boundless resource and bounded integrity. Once out of prison, he sent Network Solutions what purported to be a letter he had received from Online Classifieds. It claimed the company had been "forced to dismiss Mr. Kremen," but "never got around to changing our administrative contact with the internet registration [sic] and now our Board of directors has decided to *abandon* the domain name sex.com." Why was this unusual letter being sent via Cohen rather than to Network Solutions directly? It explained:

> Because we do not have a direct connection to the internet, we request that you notify the internet registration on our

---

** The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

1. We assume basic familiarity with the Internet. Those just tuning in should read the helpful discussions in *Kremen v. Cohen,* 325 F.3d 1035, 1038–39 (9th Cir.2003) (order certifying question), and *Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 502–04 (D.C.Cir. 1999).

behalf, to delete our domain name sex. com. Further, we have no objections to your use of the domain name sex.com and this letter shall serve as our authorization to the internet registration to transfer sex.com to your corporation.[2] Despite the letter's transparent claim that a company called *"Online* Classifieds" had no Internet connection, Network Solutions made no effort to contact Kremen. Instead, it accepted the letter at face value and transferred the domain name to Cohen. When Kremen contacted Network Solutions some time later, he was told it was too late to undo the transfer. Cohen went on to turn sex.com into a lucrative online porn empire.

And so began Kremen's quest to recover the domain name that was rightfully his. He sued Cohen and several affiliated companies in federal court, seeking return of the domain name and disgorgement of Cohen's profits. The district court found that the letter was indeed a forgery and ordered the domain name returned to Kremen. It also told Cohen to hand over his profits, invoking the constructive trust doctrine and California's "unfair competition" statute, Cal. Bus. & Prof.Code § 17200 *et seq.* It awarded $40 million in compensatory damages and another $25 million in punitive damages.[3]

Kremen, unfortunately, has not had much luck collecting his judgment. The district court froze Cohen's assets, but Cohen ignored the order and wired large sums of money to offshore accounts. His real estate property, under the protection of a federal receiver, was stripped of all its fixtures—even cabinet doors and toilets—in violation of another order. The court commanded Cohen to appear and show cause why he shouldn't be held in contempt, but he ignored that order, too. The district judge finally took off the gloves— he declared Cohen a fugitive from justice, signed an arrest warrant and sent the U.S. Marshals after him.

Then things started getting *really* bizarre. Kremen put up a "wanted" poster on the sex.com site with a mug shot of Cohen, offering a $50,000 reward to anyone who brought him to justice. Cohen's lawyers responded with a motion to vacate the arrest warrant. They reported that Cohen was under house arrest in Mexico and that gunfights between Mexican authorities and would-be bounty hunters seeking Kremen's reward money posed a threat to human life. The district court rejected this story as "implausible" and denied the motion. Cohen, so far as the record shows, remains at large.

Given his limited success with the bounty hunter approach, it should come as no surprise that Kremen seeks to hold someone else responsible for his losses. That someone is Network Solutions, the exclusive domain name registrar at the time of Cohen's antics. Kremen sued it for mishandling his domain name, invoking four theories at issue here. He argues that he had an implied contract with Network Solutions, which it breached by giving the domain name to Cohen. He also claims the transfer violated Network Solutions's cooperative agreement with the National Science Foundation—the government contract that made Network Solutions

---

**2.** The letter was signed "Sharon Dimmick," purported president of Online Classifieds. Dimmick was actually Kremen's housemate at the time; Cohen later claimed she sold him the domain name for $1000. This story might have worked a little better if Cohen hadn't misspelled her signature.

**3.** We dismissed Cohen's appeal in an unpublished memorandum disposition. *See Kremen v. Cohen,* Nos. 01–15886+, 2002 WL 2017073, 45 Fed.Appx. 746 (9th Cir. Aug. 30, 45 Fed.Appx. 746 (9th Cir. Aug. 30, 2002).

the .com registrar. His third theory is that he has a property right in the domain name sex.com, and Network Solutions committed the tort of conversion by giving it away to Cohen. Finally, he argues that Network Solutions was a "bailee" of his domain name and seeks to hold it liable for "conversion by bailee."

The district court granted summary judgment in favor of Network Solutions on all claims. *Kremen v. Cohen,* 99 F.Supp.2d 1168 (N.D.Cal.2000). It held that Kremen had no implied contract with Network Solutions because there was no consideration: Kremen had registered the domain name for free. *Id.* at 1171–72. It rejected the third-party contract claim on the ground that the cooperative agreement did not indicate a clear intent to grant enforceable contract rights to registrants. *Id.* at 1172.

The conversion claims fared no better. The court agreed that sex.com was Kremen's property. It concluded, though, that it was intangible property to which the tort of conversion does not apply. *Id.* at 1173. The conversion by bailee claim failed for the additional reason that Network Solutions was not a bailee. *Id.* at 1175.

Kremen appeals, and we consider each of his four theories in turn.

### Breach of Contract

■ Kremen had no express contract with Network Solutions, but argues that his registration created an implied contract, which Network Solutions breached. A defendant is normally not liable for breach of contract, however, if he promised to do something for free. The party claiming breach must show that, in return for the promise, it conferred some benefit the other party was not already entitled to receive, or suffered some prejudice it was not already bound to endure. Cal. Civ. Code § 1605.[4] The adequacy of consideration doesn't matter, but it must be "something of real value." *Herbert v. Lankershim,* 9 Cal.2d 409, 475, 71 P.2d 220 (1937) (internal quotation marks omitted).

Kremen did not pay Network Solutions or exchange some other property in return for his domain name. Nor did his registration increase the amount of money Network Solutions received from the National Science Foundation; under the cooperative agreement, Network Solutions was paid on a fixed-fee basis. The cooperative agreement did contemplate that Network Solutions might one day charge fees. Kremen seizes on this fact and claims he conferred a benefit on Network Solutions by becoming a customer "at a time when [it] was eager to expand its customer base."

■ The problem with this theory is that Kremen was a nonpaying customer, so his status as a registrant was valuable only because of the possibility he might stick around if Network Solutions started charging fees. Kremen was under no obligation to do so. He was in the same position as one who promises to do something but reserves the right to change his mind. *See, e.g., County of Alameda v. Ross,* 32 Cal.App.2d 135, 143–44, 89 P.2d 460 (1939); 1 Witkin *Contracts* § 234. He might have become a paying customer or he might not; the choice was up to him once Network Solutions started charging fees. As many Internet investors found out the hard way, "[mere] ... hope of profit is not consideration." *Williams v. Hasshagen,* 166 Cal. 386, 390, 137 P. 9 (1913).

---

**4.** Neither party argued choice of law, so we apply California law throughout. *See McGhee* *v. Arabian Am. Oil Co.,* 871 F.2d 1412, 1424 (9th Cir.1989).

Kremen argues that he gave Network Solutions valuable marketing data by submitting his contact information when he registered the domain name. But there is no evidence that Network Solutions sought the data as part of its benefit of the bargain. *See Bard v. Kent,* 19 Cal.2d 449, 452, 122 P.2d 8 (1942). It collected only information reasonably necessary to complete the registration process. Any marketing value it had was an incidental consequence of the process. This is not a case where a party's actions can only be explained as a gimmick to collect customer information; Network Solutions was giving away domain names because the National Science Foundation was paying it to do so. Knowledge of the recipient's identity is a nearly inevitable consequence of any gift. Absent evidence it was actually something the donor bargained for, it is not consideration.

Kremen did not give consideration for his domain name, so he had no contract with Network Solutions. *Cf. Oppedahl & Larson v. Network Solutions, Inc.,* 3 F.Supp.2d 1147, 1160–61 (D.Colo.1998).

### Breach of Third–Party Contract

■ We likewise reject Kremen's argument based on Network Solutions's cooperative agreement with the National Science Foundation. A party can enforce a third-party contract only if it reflects an "express or implied intention of the parties to the contract to benefit the third party." *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1211 (9th Cir. 1999). "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract." *Id.* When a contract is with a government entity, a more stringent

test applies: "Parties that benefit ... are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary." *Id.* The contract must establish not only an intent to confer a benefit, but also "an intention ... to grant [the third party] enforceable rights." *Id.*

Kremen relies on language in the agreement providing that Network Solutions had "primary responsibility for ensuring the quality, timeliness and effective management of [domain name] registration services" and that it was supposed to "facilitate the most effective, efficient and ubiquitous registration services possible." This language does not indicate a clear intent to grant registrants enforceable contract rights. We accordingly reject Kremen's claim. *Cf. Oppedahl & Larson,* 3 F.Supp.2d at 1157–59.

### Conversion

■ Kremen's conversion claim is another matter. To establish that tort, a plaintiff must show "ownership or right to possession of property, wrongful disposition of the property right and damages." *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.,* 958 F.2d 896, 906 (9th Cir.1992). The preliminary question, then, is whether registrants have property rights in their domain names. Network Solutions all but concedes that they do. This is no surprise, given its positions in prior litigation. *See Network Solutions, Inc. v. Umbro Int'l, Inc.,* 259 Va. 759, 529 S.E.2d 80, 86 (2000) ("[Network Solutions] acknowledged during oral argument before this Court that the right to use a domain name is a form of intangible personal property."); *Network Solutions, Inc. v. Clue Computing, Inc.,* 946 F.Supp. 858, 860 (D.Colo.1996) (same).[5] The district court

**5.** Network Solutions does suggest in passing     that we should distinguish domain names

agreed with the parties on this issue, as do we.

Property is a broad concept that includes "every intangible benefit and prerogative susceptible of possession or disposition." *Downing v. Mun. Court*, 88 Cal.App.2d 345, 350, 198 P.2d 923 (1948) (internal quotation marks omitted). We apply a three-part test to determine whether a property right exists: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *G.S. Rasmussen*, 958 F.2d at 903 (footnote omitted). Domain names satisfy each criterion. Like a share of corporate stock or a plot of land, a domain name is a well-defined interest. Someone who registers a domain name decides where on the Internet those who invoke that particular name—whether by typing it into their web browsers, by following a hyperlink, or by other means—are sent. Ownership is exclusive in that the registrant alone makes that decision. Moreover, like other forms of property, domain names are valued, bought and sold, often for millions of dollars, *see* Greg Johnson, *The Costly Game for Net Names*, L.A. Times, Apr. 10, 2000, at A1, and they are now even subject to in rem jurisdiction, *see* 15 U.S.C. § 1125(d)(2).

Finally, registrants have a legitimate claim to exclusivity. Registering a domain name is like staking a claim to a plot of land at the title office. It informs others that the domain name is the registrant's and no one else's. Many registrants also invest substantial time and money to de-velop and promote websites that depend on their domain names. Ensuring that they reap the benefits of their investments reduces uncertainty and thus encourages investment in the first place, promoting the growth of the Internet overall. *See G.S. Rasmussen*, 958 F.2d at 900.

Kremen therefore had an intangible property right in his domain name, and a jury could find that Network Solutions "wrongful[ly] dispos[ed] of" that right to his detriment by handing the domain name over to Cohen. *Id.* at 906. The district court nevertheless rejected Kremen's conversion claim. It held that domain names, although a form of property, are intangibles not subject to conversion. This rationale derives from a distinction tort law once drew between tangible and intangible property: Conversion was originally a remedy for the wrongful taking of another's lost goods, so it applied only to tangible property. *See Prosser and Keeton on the Law of Torts* § 15, at 89, 91 (W. Page Keeton ed., 5th ed.1984). Virtually every jurisdiction, however, has discarded this rigid limitation to some degree. *See id.* at 91. Many courts ignore or expressly reject it. *See Kremen*, 325 F.3d at 1045–46 n. 5 (Kozinski, J., dissenting) (citing cases); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y.2003) (holding that the plaintiff could maintain a claim for conversion of his website); Val D. Ricks, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine*, 1991 B.Y.U. L. Rev. 1681, 1682. Others reject it for some intangibles but not others. The *Restatement*, for example, recommends the following test:

---

supported by contracts from those (like Kremen's) that are not. It also stresses that Kremen didn't develop the sex.com site before Cohen stole it. But this focus on the particular domain name at issue is misguided. The question is not whether Kremen's domain name in isolation is property, but whether domain names as a class are a species of property.

(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.

(2) One who effectively prevents the exercise of intangible rights of the kind customarily *merged in a document* is subject to a liability similar to that for conversion, even though the document is not itself converted.

*Restatement (Second) of Torts* § 242 (1965) (emphasis added). An intangible is "merged" in a document when, "by the appropriate rule of law, the right to the immediate possession of a chattel and the power to acquire such possession is *represented by* [the] document," or when "an intangible obligation [is] *represented by* [the] document, which is regarded as equivalent to the obligation." *Id.* cmt. a (emphasis added).[6] The district court applied this test and found no evidence that Kremen's domain name was merged in a document.

The court assumed that California follows the *Restatement* on this issue. Our review, however, revealed that "there do not appear to be any California cases squarely addressing whether the 'merged with' requirement is a part of California law." *Kremen,* 325 F.3d at 1042. We invoked the California Supreme Court's certification procedure to offer it the opportunity to address the issue. *Id.* at 1043; Cal. Rules of Court 29.8. The Court declined, *Kremen v. Cohen,* No. S112591

(Cal. Feb. 25, 2003), and the question now falls to us.

We conclude that California does not follow the *Restatement*'s strict merger requirement. Indeed, the leading California Supreme Court case rejects the tangibility requirement altogether. In *Payne v. Elliot,* 54 Cal. 339, 1880 WL 1907 (1880), the Court considered whether shares in a corporation (as opposed to the share certificates themselves) could be converted. It held that they could, reasoning: "[T]he action no longer exists as it did at common law, but has been developed into a remedy for the conversion of *every species of personal property.*" *Id.* at 341 (emphasis added). While *Payne*'s outcome might be reconcilable with the *Restatement,* its rationale certainly is not: It recognized conversion of shares, not because they are customarily represented by share certificates, but because they are a species of personal property and, perforce, protected. *Id.* at 342.[7]

Notwithstanding *Payne*'s seemingly clear holding, the California Court of Appeal held in *Olschewski v. Hudson,* 87 Cal.App. 282, 262 P. 43 (1927), that a laundry route was not subject to conversion. It explained that *Payne*'s rationale was "too broad a statement as to the application of the doctrine of conversion." *Id.* at 288, 262 P. 43. Rather than follow binding California Supreme Court precedent, the court retheorized *Payne* and held that corporate stock could be converted only because it was "represented by" a tangible

---

6. The *Restatement* does note that conversion "has been applied by some courts in cases where the converted document is not in itself a symbol of the rights in question, but is merely essential to their protection and enforcement, as in the case of account books and receipts." *Id.* cmt. b.

7. Intangible interests in *real* property, on the other hand, remain unprotected by conver-

sion, presumably because trespass is an adequate remedy. *See Goldschmidt v. Maier,* 73 P. 984, 985 (Cal.1903) (per curiam) ("[A] leasehold of real estate is not the subject of an action of trover."); *Vuich v. Smith,* 140 Cal. App. 453, 455, 35 P.2d 365 (1934) (same). Some California cases also preserve the traditional exception for indefinite sums of money. *See* 5 Witkin *Torts* § 614.

document. *Id.; see also Adkins v. Model Laundry Co.*, 92 Cal.App. 575, 583, 268 P. 939 (1928) (relying on *Olschewski* and holding that no property right inhered in "the intangible interest of an exclusive privilege to collect laundry").

Were *Olschewski* the only relevant case on the books, there might be a plausible argument that California follows the *Restatement*. But in *Palm Springs–La Quinta Development Co. v. Kieberk Corp.*, 46 Cal.App.2d 234, 115 P.2d 548 (1941), the court of appeal allowed a conversion claim for intangible information in a customer list when some of the index cards on which the information was recorded were destroyed. The court allowed damages not just for the value of the cards, but for the value of the intangible information lost. *See id.* at 239, 115 P.2d 548. Section 242(1) of the *Restatement,* however, allows recovery for intangibles only if they are merged in the converted document. Customer information is not merged in a document in any meaningful sense. A Rolodex is not like a stock certificate that actually *represents* a property interest; it is only a means of recording information.

*Palm Springs* and *Olschewski* are reconcilable on their facts—the former involved conversion of the document itself while the latter did not. But this distinction can't be squared with the *Restatement.* The plaintiff in *Palm Springs* recovered damages for the value of his intangibles. But if those intangibles were merged in the index cards for purposes of section 242(1), the plaintiffs in *Olschewski* and *Adkins* should have recovered under section 242(2)—laundry routes surely are customarily written

down *somewhere.* "Merged" can't mean one thing in one section and something else in the other.

California courts ignored the *Restatement* again in *A & M Records, Inc. v. Heilman,* 75 Cal.App.3d 554, 142 Cal.Rptr. 390 (1977), which applied the tort to a defendant who sold bootlegged copies of musical recordings. The court held broadly that "such misappropriation and sale of the intangible property of another without authority from the owner is conversion." *Id.* at 570, 142 Cal.Rptr. 390. It gave no hint that its holding depended on whether the owner's intellectual property rights were merged in some document. One might imagine physical things with which the intangible was associated—for example, the medium on which the song was recorded. But an intangible intellectual property right in a song is not merged in a phonograph record in the sense that the record *represents* the composer's intellectual property right. The record is not like a certificate of ownership; it is only a medium for one instantiation of the artistic work.[8]

Federal cases applying California law take an equally broad view. We have applied *A & M Records* to intellectual property rights in an audio broadcast, *see Lone Ranger Television, Inc. v. Program Radio Corp.,* 740 F.2d 718, 725 (9th Cir. 1984), and to a regulatory filing, *see G.S. Rasmussen,* 958 F.2d at 906–07. Like *A & M Records,* both decisions defy the *Restatement*'s "merged in a document" test. An audio broadcast may be recorded on a tape and a regulatory submission may be typed on a piece of paper, but neither

---

**8.** The California Court of Appeal addressed the issue most recently in *Thrifty–Tel, Inc. v. Bezenek,* 46 Cal.App.4th 1559, 54 Cal.Rptr.2d 468 (1996), which noted that courts had "traditionally" refused to acknowledge conversion of intangibles "not merged with, or re-

flected in, something tangible." *Id.* at 1565, 54 Cal.Rptr.2d 468 (citing *Olschewski* and *Adkins*). The court declined to decide whether that limitation was still good law and resolved the case on other grounds. *See id.* at 1565–66, 54 Cal.Rptr.2d 468.

document *represents* the owner's intangible interest.

The Seventh Circuit interpreted California law in *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300 (7th Cir.1990). Observing that " '[t]here is perhaps no very valid and essential reason why there might not be conversion' of intangible property," *id.* at 305 (quoting *Prosser & Keeton, supra,* § 15, at 92), it held that a defendant could be liable merely for depriving the plaintiff of the use of his confidential information, *id.* at 304. In rejecting the tangibility requirement, *FMC* echoes *Payne*'s holding that personal property of any species may be converted. And it flouts the *Restatement* because the intangible property right in confidential information is not represented by the documents on which the information happens to be recorded.

Our own recent decision in *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082 (9th Cir.2000), is especially relevant. That case involved a domain name—precisely the type of property at issue here. The primary question was personal jurisdiction, but a majority of the panel joined the judgment only on the understanding that the defendant had committed conversion of a domain name, which it characterized as "tortious conduct." *Id.* at 1089 (Sneed & Trott, JJ., concurring); *cf.* *Astroworks, Inc.*, 257 F.Supp.2d at 618 (holding that the plaintiff could maintain a claim for conversion of his website).

In short, California does not follow the *Restatement*'s strict requirement that some document must actually represent the owner's intangible property right. On the contrary, courts routinely apply the tort to intangibles without inquiring whether they are merged in a document and, while it's often possible to dream up *some* document the intangible is connected to in some fashion, it's seldom one that represents the owner's property interest. To the extent *Olschewski* endorses the strict merger rule, it is against the weight of authority. That rule cannot be squared with a jurisprudence that recognizes conversion of music recordings, radio shows, customer lists, regulatory filings, confidential information and even domain names.[9]

Were it necessary to settle the issue once and for all, we would toe the line of *Payne* and hold that conversion is "a remedy for the conversion of every species of personal property." 54 Cal. at 341. But we need not do so to resolve this case. Assuming *arguendo* that California retains some vestigial merger requirement, it is clearly minimal, and at most requires only *some* connection to a document or tangible object—not representation of the owner's intangible interest in the strict *Restatement* sense.

Kremen's domain name falls easily within this class of property. He argues that the relevant document is the Domain Name System, or "DNS"—the distributed electronic database that associates domain names like sex.com with particular computers connected to the Internet.[10] We

**9.** Witkin cites the *Restatement* favorably. *See* 5 Witkin *Torts* § 613. Notably, though, he points to only three cases rejecting conversion of intangibles: *Olschewski* (which disavowed binding California Supreme Court authority directly on point, *see* pp. 1031–32 *supra*); *Vuich* (which involved real estate and so was not within *Payne*'s holding anyway, *see* n. 7 *supra*); and *Italiani v. Metro–Goldwyn–Mayer*

*Corp.,* 45 Cal.App.2d 464, 114 P.2d 370 (1941) (which denied protection to intellectual property rights and has been overtaken by later cases such as *A & M Records* and *Lone Ranger Television, see* p. 1032 *supra*).

**10.** Network Solutions complains about the absence of specific record evidence regarding the DNS. But whether domain names are a

agree that the DNS is a document (or perhaps more accurately a collection of documents). That it is stored in electronic form rather than on ink and paper is immaterial. *See, e.g., Thrifty–Tel,* 46 Cal. App.4th at 1565, 54 Cal.Rptr.2d 468 (recognizing conversion of information recorded on floppy disk); *A & M Records,* 75 Cal. App.3d at 570, 142 Cal.Rptr. 390 (same for audio record); *Lone Ranger Television,* 740 F.2d at 725 (same for magnetic tape). It would be a curious jurisprudence that turned on the existence of a *paper* document rather than an electronic one. Torching a company's file room would then be conversion while hacking into its mainframe and deleting its data would not. That is not the law, at least not in California.[11]

The DNS also bears some relation to Kremen's domain name. We need not delve too far into the mechanics of the Internet to resolve this case. It is sufficient to observe that information correlating Kremen's domain name with a particular computer on the Internet must exist somewhere in some form in the DNS; if it did not, the database would not serve its intended purpose. Change the information in the DNS, and you change the website people see when they type "www.sex. com."

Network Solutions quibbles about the mechanics of the DNS. It points out that the data corresponding to Kremen's domain name is not stored in a single record, but is found in several different places: The components of the domain name ("sex" and "com") are stored in two different places, and each is copied and stored on several machines to create redundancy and speed up response times. Network Solutions's theory seems to be that intangibles are not subject to conversion unless they are associated only with a *single* document.

Even if Network Solutions were correct that there is no single record in the DNS architecture with which Kremen's intangible property right is associated, that is no impediment under California law. A share of stock, for example, may be evidenced by more than one document. *See Payne,* 54 Cal. at 342 ("[T]he certificate is only evidence of the property; and it is not the only evidence, for a transfer on the books of the corporation, without the issuance of a certificate, vests title in the shareholder: the certificate is, therefore, but additional evidence of title . . . ."); *see also Phansalkar v. Andersen Weinroth & Co.,* 175 F.Supp.2d 635, 640–42 (S.D.N.Y.2001) (citing *Payne*). A customer list is protected, even if it's recorded on index cards rather than a single piece of paper. *See Palm Springs,* 46 Cal.App.2d 234, 115 P.2d 548. Audio recordings may be duplicated, *see A & M Records,* 75 Cal.App.3d 554, 142 Cal. Rptr. 390; *Lone Ranger Television,* 740 F.2d 718, and confidential information and

---

species of property to which conversion applies is a question of law rather than of adjudicative fact; we may consider record evidence but need not so restrict ourselves. *See* Fed.R.Evid. 201(a) advisory committee notes. Network Solutions has had ample opportunity to contest the nature of the DNS in both its answering brief on appeal and its response to amici. It has raised no material point of dispute.

**11.** The *Restatement* requires intangibles to be merged only in a "document," not a *tangible* document. *Restatement (Second) of Torts*

§ 242. Our holding therefore does not depend on whether electronic records are tangible. *Compare eBay, Inc. v. Bidder's Edge, Inc.,* 100 F.Supp.2d 1058, 1069 (N.D.Cal. 2000) ("[I]t appears likely that the electronic signals sent by [Bidder's Edge] to retrieve information from eBay's computer system are . . . sufficiently tangible to support a trespass cause of action."), *with Intel Corp. v. Hamidi,* 30 Cal.4th 1342, 1 Cal.Rptr.3d 32, 47–48, 71 P.3d 296, (2003) (implying that electronic signals are intangible).

regulatory filings may be photocopied, *see FMC*, 915 F.2d 300; *G.S. Rasmussen*, 958 F.2d 896. Network Solutions's "single document" theory is unsupported.

Network Solutions also argues that the DNS is not a document because it is refreshed every twelve hours when updated domain name information is broadcast across the Internet. This theory is even less persuasive. A document doesn't cease being a document merely because it is often updated. If that were the case, a share registry would fail whenever shareholders were periodically added or dropped, as would an address file whenever business cards were added or removed. Whether a document is updated by inserting and deleting particular records or by replacing an old file with an entirely new one is a technical detail with no legal significance.

Kremen's domain name is protected by California conversion law, even on the grudging reading we have given it. Exposing Network Solutions to liability when it gives away a registrant's domain name on the basis of a forged letter is no different from holding a corporation liable when it gives away someone's shares under the same circumstances. *See Schneider v. Union Oil Co.*, 6 Cal.App.3d 987, 992, 86 Cal.Rptr. 315 (1970); *Ralston v. Bank of Cal.*, 112 Cal. 208, 213, 44 P. 476 (1896). We have not "creat[ed] new tort duties" in reaching this result. *Cf. Moore v. Regents of the Univ. of Cal.*, 51 Cal.3d 120, 146, 271 Cal.Rptr. 146, 793 P.2d 479 (1990). We have only applied settled principles of conversion law to what the parties and the district court all agree is a species of property.

The district court supported its contrary holding with several policy rationales, but none is sufficient grounds to depart from the common law rule. The court was reluctant to apply the tort of conversion because of its strict liability nature. This concern rings somewhat hollow in this case because the district court effectively exempted Network Solutions from liability to Kremen altogether, whether or not it was negligent. Network Solutions made no effort to contact Kremen before giving away his domain name, despite receiving a facially suspect letter from a third party. A jury would be justified in finding it was unreasonably careless.

We must, of course, take the broader view, but there is nothing unfair about holding a company responsible for giving away someone else's property even if it was not at fault. Cohen is obviously the guilty party here, and the one who should in all fairness pay for his theft. But he's skipped the country, and his money is stashed in some offshore bank account. Unless Kremen's luck with his bounty hunters improves, Cohen is out of the picture. The question becomes whether Network Solutions should be open to liability for its decision to hand over Kremen's domain name. Negligent or not, it was Network Solutions that gave away Kremen's property. Kremen never did anything. It would not be unfair to hold Network Solutions responsible and force *it* to try to recoup its losses by chasing down Cohen. This, at any rate, is the logic of the common law, and we do not lightly discard it.

The district court was worried that "the threat of litigation threatens to stifle the registration system by requiring further regulations by [Network Solutions] and potential increases in fees." *Kremen*, 99 F.Supp.2d at 1174. Given that Network Solutions's "regulations" evidently allowed it to hand over a registrant's domain name on the basis of a facially suspect letter without even contacting him, "further regulations" don't seem like such a bad idea. And the prospect of higher fees presents no issue here that it doesn't in any other context. A bank could lower its ATM fees

if it didn't have to pay security guards, but we doubt most depositors would think that was a good idea.

The district court thought there were "methods better suited to regulate the vagaries of domain names" and left it "to the legislature to fashion an appropriate statutory scheme." *Id.* The legislature, of course, is always free (within constitutional bounds) to refashion the system that courts come up with. But that doesn't mean we should throw up our hands and let private relations degenerate into a free-for-all in the meantime. We apply the common law until the legislature tells us otherwise. And the common law does not stand idle while people give away the property of others.

The evidence supported a claim for conversion, and the district court should not have rejected it.

### Conversion by Bailee

Kremen's complaint finally alleges a separate claim for "conversion by bailee." The district court granted summary judgment, holding that Network Solutions was not a bailee of Kremen's property.

■ We need not decide the issue because Kremen's "conversion by bailee" claim does not state a cause of action independent of his conversion claim. As we read California law, "conversion by bailee" is not a distinct tort, but merely the tort of conversion committed by one who is a bailee. *See, e.g., Byer v. Can. Bank of Commerce,* 8 Cal.2d 297, 300–01, 65 P.2d 67 (1937); *Gonzales v. Pers. Storage, Inc.,* 56 Cal.App.4th 464, 476–77, 65 Cal.Rptr.2d 473 (1997); 4 Witkin *Personal Property* § 138; 5 Witkin *Torts* § 622. Kremen's complaint does not allege any claim of bailee liability other than conversion. *Cf., e.g., Windeler v. Scheers Jewelers,* 8 Cal.App.3d 844, 850–52, 88 Cal.Rptr. 39 (1970) (negligent breach of the bailment contract). To prove "conversion by bail-

ee," Kremen must establish all the elements of conversion but, having done so, he gains nothing by also showing that Network Solutions is a bailee.

\* \* \*

Kremen had a viable claim for conversion. The judgment of the district court is reversed on this count, and the case is remanded for further proceedings.

**AFFIRMED in part, REVERSED in part and REMANDED. No costs.**