*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ALISA A. PESKIN-SHEPHERD, PLLC,

Plaintiff-Appellee,

v

NICOLE BLUME formerly known as NICOLE
KNUFF,

Defendant-Appellant,

and

SEAN BLUME,

Defendant.

UNPUBLISHED
November 5, 2020

No. 348023
Oakland Circuit Court
LC No. 2016-154544-CK

Before: LETICA, P.J., and FORT HOOD and GLEICHER, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

The majority holds that defendant Nicole Blume converted plaintiff Alisa A. Peskin-Shepherd's lien interest in real property in Escanaba by selling the property and using the sale proceeds to pay other debts. Whether the tort of conversion applies in this case presents a difficult question, as the length and depth of the majority opinion reflects. If it does—a proposition I do not accept—the majority has misperceived the nature of the "property" converted. I would hold that Michigan tort law does not support that a conversion occurred under the circumstances presented. If I am incorrect on that score, I would nevertheless remand for a recalculation of the principal and interested owed.

# I

Peskin-Shepherd represented Nicole Blume in a contentious divorce action.[1]  The divorce judgment provided: "Plaintiff's attorney, ALISA A. PESKIN-SHEPHERD, shall retain a lien on the assets awarded to Plaintiff, NICOLE M. KNUFF, including Plaintiff's interest in the Escanaba property, to insure payment of attorney fees."  The amount of the lien was not litigated or memorialized anywhere, and the lien itself was not recorded.  Nicole sold the Escanaba property for $39,109.08 and deposited the proceeds in her bank account.  She used the money to pay creditors other than Peskin-Shepherd.  At that point, she owed Peskin-Shepherd over $50,000.

Peskin-Shepherd's third amended complaint described a claim for common-law conversion involving the Escanaba property as follows:

> 117.  Nicole . . . knowingly and wrongfully . . . exerted dominion over Peskin-Shepherd's interest in the Escanaba property by . . . arranging for Nicole to obtain all the proceeds from the sale of the Escanaba property without first satisfying Peskin-Shepherd's lien and paying Peskin-Shepherd the balance owed for attorney services and costs.

> 118.  Nicole utilized the proceeds from the sale of the Escanaba property without first paying Peskin-Shepherd the balance owed for attorney services and costs.

> 119.  Nicole thereby disposed of the . . . Escanaba propert[y] in a manner that was inconsistent with and in violation of Peskin-Shepherd's interest in [this] properties.

> *  *  *

> 122.  Nicole['s] actions constituted common law conversion.

The third amended complaint also stated a claim for statutory conversion, which permits trebling the "actual damages" resulting from "[a]nother person's . . . converting property to the other person's own use."  MCL 600.2919a(1)(a).  The statutory conversion averments mirror those in the common-law conversion count, with the addition of the allegation that Nicole converted Peskin-Shepherd's interest in the proceeds "to her [Nicole's] own use."

The trial court granted partial summary disposition in Peskin-Shepherd's favor on the common-law and statutory conversion claims, reserving the question of damages.  Following a trial, the court trebled the amount of Peskin-Shepherd's total lien amount ($51,098.68), rather than the actual proceeds of the Escanaba property sale.  The majority affirms this ruling, holding that "the 'personal property' that was converted was plaintiff's lien, not the Escanaba property itself."

---

[1] Following the majority's lead, I will refer to Nicole Blume as Nicole.  At the time of the divorce, she was Nicole Knuff.

I am unconvinced that Michigan caselaw supports an action for conversion under these circumstances. Foreign authority supports that a conversion may have occurred, but adoption of that precedent is for the Supreme Court. I part ways with the majority more definitively regarding the calculation of damages.

II

The majority concedes that neither this Court nor our Supreme Court has ever "specifically stated that an attorney's lien is a property interest capable of being converted[.]" According to the majority, both Courts have generated "a basis of law that could lead to no other conclusion." In my view, the issue is not so clear cut, and the caselaw cited by the majority points decidedly in the other direction.

Historically, the tort of conversion applied only to chattels or tangible property capable of being lost or found. Prosser tells us that conversion originated in the late 15th century as a remedy (then called trover) in "cases in which the finder of lost goods did not return them, but used them himself, or disposed of them to someone else." Prosser & Keeton, Torts (5th ed), § 15, p 89. Losing and finding lost goods eventually became unnecessary, but the requirement that the involved property qualify as tangible remained. "[T]rover became the standard remedy for any form of interference with a chattel." *Id*.

The tort evolved somewhat over time, but in many jurisdictions, including Michigan, its crux remained rooted in the idea that only the intentional interference with *physical* things—chattels or goods—could establish a conversion. Prosser tells us that some jurisdictions now recognize that the tort may embrace intangible rights that have been merged into something tangible, such as a check, a bond, or a stock certificate. *Id*. at 91. Yet as recently as 1992, our Supreme Court recited the historic formulation of conversion: "[C]onversion is defined as any distinct act of domain wrongfully exerted over another's *personal property* in denial of or inconsistent with the rights therein." *Foremost Ins Co v Allstate Ins Co*, 439 Mich 378, 391; 486 NW2d 600 (1992) (emphasis added). And even more recently, in *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 352; 871 NW2d 136 (2015), the Supreme Court reaffirmed its previous adoption of the definition of conversion provided in the *First* Restatement of Torts. That definition focuses solely on misuse of a "chattel," which denotes tangible, personal property:

"A conversion may be committed by

(a) intentionally dispossessing another of a chattel,

(b) intentionally destroying or altering a chattel in the actor's possession,

(c) using a chattel in the actor's possession without authority so to use it,

(d) receiving a chattel pursuant to a sale, lease, pledge, gift or other transaction intending to acquire for himself or for another a proprietary interest in it,

(e) disposing of a chattel by sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it,

-3-

(f) misdelivering a chattel, or

(g) refusing to surrender a chattel on demand." [*Id*. at 352, quoting 1 Restatement, Torts, § 223.[2]]

The salient question presented in this case is whether the proceeds of a lien can be regarded as a "chattel" capable of being converted. The majority answers in the affirmative, drawing primarily on language located in three cases: *Stewart v Young*, 247 Mich 451, 455; 226 NW 222 (1929); *Garras v Bekiares*, 315 Mich 141, 148-149; 23 NW2d 239 (1946); and *Warren Tool Co v Stephenson*, 11 Mich App 274; 161 NW2d 133 (1968). I do not read these cases as capaciously as does the majority and find them either unhelpful or in conflict with the majority's holding.

*Stewart* was an action for an accounting that arose from the parties' real estate investments and joint ventures—agreements that were never reduced to writing. When the involved real properties were sold, the defendant pocketed the profit and the plaintiff demanded an accounting. *Stewart*, 247 Mich at 454-455. The defendant refused the accounting, invoking the statute of frauds. The trial court denied the plaintiff relief on statute-of-frauds grounds. The Supreme Court reversed, explaining that the statute of frauds did not apply because the sale proceeds "are not real estate but personal property," and adding that "[t]he contract has been partially performed." *Id*. at 455.[3] *Stewart* concerns the right to an accounting in a business venture that happens to involve real estate. It is not a case about conversion. The Court's throw-away line characterizing the proceeds of the joint ventures as "personal property" brought the dispute outside the statute of frauds but does not provide much guidance in the tort context. The Court likely used the term "personal property" simply to distinguish the money earned by selling the real estate from the real estate itself.

*Garras* is more enlightening, but does not advance the majority's position. There, the defendant agreed to sell hams on consignment from the plaintiff. The parties agreed that title to the hams would remain with the plaintiff until the hams were sold, and that the defendant would pay the plaintiff for "all accounts receivable" from the proceeds of the ham sales. *Garras*, 315 Mich at 143-144. The plaintiff believed that the defendant was not properly accounting for the hams sold and the money collected, and so the parties entered into a settlement agreement that included the following provisions characterizing the defendant's actions as "conversion":

---

[2] In *Aroma Wines*, the Supreme Court did not even mention the definition of conversion contained in the *Second* Restatement of Torts, which also describes a chattel-centric tort: "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement Torts, 2d, § 222A(1). As discussed below, the Second Restatement also includes a provision that might allow for a lien to be considered personal property creating liability if converted.

[3] "[U]nder the well-settled rule in equity, partial performance excepts . . . a contract [for the sale of an interest in real estate] from the operation of the statute of frauds[.]" *Frank v American Trust Co*, 259 Mich 394, 397; 243 NW 240 (1932).

> Whereas, second party (defendant) has heretofore obtained merchandise in the nature of meat products from first party (plaintiff), on consignment under the terms of a written agreement heretofore entered into between the parties hereto; and
>
> Whereas, second party has disposed of said merchandise contrary to the terms of said agreement, and wilfully converted the same or the monies derived from the sale of the said merchandise to his own use and benefit . . . . [*Id*. at 144.]

The settlement fell apart when the defendant defaulted on his agreement to pay. The plaintiff sued, and the defendant admitted that he owed the plaintiff $3,988.21. The trial court found for the plaintiff only "in assumpsit" (contract) rather than for conversion in tort.[4] The question presented in the Supreme Court was whether the plaintiff was entitled to judgment in tort or contract. *Id*. at 146.

The Supreme Court held that that the plaintiff "was not entitled to a judgment in tort for conversion" because the plaintiff "was not entitled to the *specific or identical moneys* collected by defendant from his customers[.]" *Id*. at 147 (emphasis added). The "specific or identical money" distinction was critical to the Court's holding. The Court explained that under the parties' consignment agreement, "when defendant sold the merchandise, title passed to him and from him to his customers[,]" and no conversion occurred. *Id*. at 146. The plaintiff "carried a running account," and "[a]lthough the assignment agreement provided in general terms for the assignment and transfer of all defendant's accounts receivable to plaintiff, the record does not show specifically what money, if any, he collected on these accounts and failed to account for." *Id*. at 147. The Court observed that the defendant "was not required to deliver to plaintiff the specific or identical moneys which he collected for merchandise sold or on accounts receivable, but was only required to pay plaintiff the invoiced price for merchandise delivered to him." *Id*. For this reason, an action in conversion could not lie. Citing older authority, the Court reminded that "[t]rover is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money intrusted to his care." *Id*. at 148 (quotation marks and citation omitted).

*Garras* instructs that when it comes to money, there can be no conversion unless the plaintiff identifies the *specific* money that a defendant was obligated to deliver. Failure to pay a debt from the proceeds of a pot of money is not conversion under *Garras*, unless the defendant's share is in some manner specifically identified.[5]

Like *Garras*, the facts of this case do not provide support for the proposition that Peskin-Shepherd was entitled to the "specific or identical" money that was paid for the Escanaba property.

---

[4] "The remedy in tort is more favorable to the aggrieved party in some respects than is the asserted right of action in assumpsit, although as a general rule the measure of damages is the value at time of conversion." *Janiszewski v Behrmann*, 345 Mich 8, 36; 75 NW2d 77 (1956).

[5] For example, if the parties had agreed that the plaintiff was entitled to all of the $20 bills or gold coins collected or earned in an enterprise, an action for conversion could be sustained under *Garras*.

Most likely there was no actual money, just electronic transfers of funds. More concretely, the divorce judgement does not mention the amount of money that Nicole owed in attorney fees. At the time Peskin-Shepherd's lien was incorporated into the divorce judgment, no one knew the sale value of the Escanaba property, either. No "specific" sum of money was identified at all, placing this case in precisely the same factual frame as *Garras*. The lien represented a simple debt (like the overdue account in *Garras*), rather than "specific" money. See also *Thrift v Haner*, 286 Mich 495, 496; 282 NW 219 (1938) (finding no conversion related to money collected by an officer of a hockey league who failed to turn over the plaintiff's share of the profits from a contract regarding the use of an ice hockey rink).

Which brings us to *Warren Tool Co v Stephenson*, 11 Mich App 274. This Court's lengthy opinion centers primarily on whether the facts supported the existence of an equitable lien. *Id*. at 281-298. The final pages of the opinion address conversion, but this Court did not decide whether the tort had been established. Rather, this Court provided guidance regarding conversion for the trial court on remand; I interpret the thrust of that guidance differently than does the majority.

The majority correctly notes that in *Warren Tool*, this Court held that the defendants' withholding of money due to the plaintiff created an equitable lien in the plaintiffs' favor. In its haste to analogize an equitable lien with the lien imposed in this case, the majority skims over the *Warren Tool* Court's analysis regarding conversion. That analysis is not fairly reduced to the general proposition that a lien is a form of chattel capable of being converted, contrary to the majority's efforts to fit it into that box.

The plaintiff in *Warren Tool* was a toolmaking company. It agreed to provide tooling for the defendants' company to sell to a third party, Highway Products, Inc. *Id*. at 277.[6] Because the plaintiff was concerned about getting paid, it demanded some sort of security for the tooling. The parties ultimately agreed that an Ohio bank, rather than Stephenson Industries, would write the payment checks to suppliers, including the plaintiff. *Id*. at 277-278. The parties' letter agreement included the specific order number associated with the Highway job and the specific amount ($16,820) that would be paid by Highway by check, deposited in the Ohio bank, and disbursed by the bank to the plaintiff and others. *Id*.

But the letter omitted a promise on the part of the defendants to actually deposit Highway's payment into the defendants' business account at the Ohio bank. *Id*. When the defendants received Highway's check, they did not deposit in the Ohio bank. Instead, they negotiated it elsewhere and used the funds for purposes other than paying the plaintiff. *Id*. at 279-280. The plaintiff sued for conversion. *Id*. at 280.

The trial court ruled that the parties had only an "illusory" arrangement because the defendants' company never put in writing that it would deposit the check into the Ohio bank. *Id*. Based on an exhaustive review of the law governing equitable liens, this Court held that the plaintiffs established an equitable lien on the Highway proceeds. *Id*. at 294-296. In other words, the plaintiffs had a property interest in the Highway check regardless of whether they had a

---

[6] As noted in the opinion, the defendants' company—Stephenson Industries—was bankrupt, and the plaintiffs sued the former president and general manager personally. *Id*. at 279.

contract. The next question was whether that property interest gave rise to a tort claim for conversion.

This Court's discussion of conversion centered firmly on the *check* issued by Highway. This Court stated:

> When Stephenson Industries deliberately obliterated plaintiffs' interest in the check, it would appear on the present record that it converted property belonging to the plaintiffs which had a value of $16,820. A negotiable instrument may be the subject of a suit for conversion and one who is authorized to collect a note and remit the proceeds may be sued for conversion if he collects but does not remit the proceeds.
>
> However, where there is no duty to pay the plaintiff *the specific moneys collected*, a suit for conversion may not be maintained. . . . [*Id*. at 298-299 (citations omitted, emphasis added).]

Both an equitable lien and the tort of conversion require proof that "the moneys have been particularly designated and dedicated to the claimant," the Court stressed. *Id*. at 299. And in *Warren Tool*, "[t]he diverted moneys were specifically allocated in the letters to the plaintiffs." *Id*. at 300.

Post-*Warren Tool*, this Court has more specifically acknowledged that a purloined check may be the subject of a conversion action. In *Pamar Enterprises, Inc v Huntington Banks of Mich*, 228 Mich App 727, 734-735; 580 NW2d 11 (1998), we noted that "[a] check is considered the personal property of the designated payee," and can be converted "if a bank makes or obtains payment with respect to the instrument for a person nontitled to enforce the instrument or receive payment." (Quotation marks and citation omitted.) In that circumstance, the intended payee may bring an action "against either the depositary bank or the drawee bank." *Id*. at 734.

No specific check is at issue in this case and therefore, *Warren Tool* is readily distinguishable. There, the defendants had in their possession a tangible object—a check made out to their company—representing a known sum as payment for an agreed-upon debt. Unlike in *Warren Tool*, the parties in this case never reached a meeting of the minds regarding Nicole's debt, there was no mutual understanding as to the value of the lien, and no specific check was ever issued (that we know of). The lien amount was undefined, unmentioned, and amorphous rather than tangible. Peskin-Shepherd had a right to be paid from the proceeds of the Escanaba sale, but no evidence supports an agreement entitling her to the actual check issued by the buyer of the property. As precedent supporting a conversion in this case, *Warren Tool* falls short.

Michigan law simply does not support the majority's conversion analysis. To the contrary, the caselaw—including *Aroma Wines*—supports that an intangible interest, such as a lien that has not been recorded or reduced to actual numbers, cannot be converted. It is more than tempting to reach the opposite conclusion, given the odiousness of Nicole's conduct. But doing so is simply inconsistent with the precedent we are bound to follow.

Nevertheless, I would urge our Supreme Court to adopt a broader view of conversion. When most business exchanges involved physical products, it made sense that the existence of a

"chattel" was a fundamental requirement of the tort. Today, however, intangibles are the subjects of much of the world's commerce. The Second Restatement of Torts recognizes this reality, as it enlarges the tort of conversion to include intangible property rights that are merged into a document: "One who effectively prevents the exercise of intangible [property] rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted." Restatement Torts, 2d, § 242(2). This section of the Restatement recognizes that "an intangible property right can be united with a tangible object for conversion purposes." *Thyroff v Nationwide Mut Ins Co*, 8 NY3d 283, 289; 832 NYS2d 873; 864 NE2d 1272 (2007). Society's "growing dependence on intangibles" such as electronic data and digital information has spurred the adoption of § 242(2) by other jurisdictions. *Id*. at 291 (quotation marks and citation omitted). But § 242(2) has not been adopted by any court in Michigan.

Perhaps the most interesting discussion of the conversion of intangibles involves a domain name, "sex.com," in *Kremen v Cohen*, 337 F3d 1024 (CA 9, 2003). Construing California law, the United States Court of Appeals for the Ninth Circuit proposed in *Kremen* a view of conversion expanding the tort well beyond the Restatement requirement of merger in a document, observing that conversion has been applied to: "music recordings, radio shows, customer lists, registry filings, confidential information and even domain names." *Id*. at 1033. Characterizing the strict application of a merger requirement as "vestigial," the Ninth Circuit declared: "Were it necessary to settle the issue once and for all, we would . . . hold that conversion is a remedy for the conversion of every species of personal property." *Id*. (quotation marks and citation omitted).[7] See also *Thyroff*, 8 NY3d at 292-293 ("[W]e believe that the tort of conversion must keep pace with the contemporary realities of widespread computer use. We therefore . . . hold that the type of data that Nationwide allegedly took possession of—electronic records that were stored on a computer and were indistinguishable from printed documents—is subject to a claim of conversion in New York.").

Peskin-Shepherd's lien on the Escanaba property was an intangible property interest reduced to writing. For that reason, the Second Restatement might very well support that Nicole converted the lien when she sold the property and did not honor her debt to Peskin-Shepherd. But both the trial court and the majority approached the issue from a different perspective, skipping over the "chattel" requirement that is today firmly engrafted in Michigan tort law. While there may be good grounds to look the other way in this case, doing so writes a new chapter in our state's tort jurisprudence. I would leave that task to the Supreme Court.

---

[7] Obviously the definition of "personal property" underlying the Ninth Circuit's opinion in *Kremen* differs from the majority's interpretation of the term as it was used by our Supreme Court in *Stewart*. "Property is a broad concept that includes every intangible benefit and prerogative susceptible of possession or disposition," the court explained. *Kremen*, 337 F3d at 1030 (quotation marks and citation omitted). But while first charactering a domain name as "personal property," the Court carefully analyzed the reasons that the tort of conversion should be reimagined to include property other than physical chattels. *Id*. at 1030-1032. This is the step that the majority's discussion of *Stewart* ignores.

## III

Were I to accept that Nicole committed the tort of conversion, I would nonetheless disagree with the majority's analysis of the measure of Peskin-Shepherd's damages. The majority holds, in essence, that Nicole converted the entirety of Peskin-Shepherd's lien by pocketing the proceeds of the Escanaba land sale. The caselaw, however, supports that the "property" converted by Nicole was the cash value of the land in Escanaba, not the lien itself. "The general rule for the measure of damages for conversion is the value of the converted property at the time of the conversion." *Ehman v Libralter Plastics, Inc*, 207 Mich App 43, 45; 523 NW2d 639 (1994). Nicole converted the proceeds of her sale of the property; she turned real property into money, and it was the money that she wrongfully withheld from Peskin-Shepherd. The third amended complaint admits this proposition by alleging that Nicole wrongfully "exerted dominion over Peskin-Shepherd's interest in the Escanaba property." That "interest" was the amount Nicole acquired when the property sold: $39,109.08.

The language of the conversion statute also compels the conclusion that the amount converted was the amount of money that Nicole applied to her "own use." MCL 600.2919a(1)(a). Nicole applied the proceeds of the sale to her own use, not the lien itself. When she used the sale proceeds to pay other debts, she deprived Peskin-Shepherd of a specific sum, not an inchoate, intangible lien interest in real property. Here is another way of looking at it: think about the tort of conversion as the civil analogue for theft. Nicole stole from Peskin-Shepherd the money that Nicole made on the land sale—she did not steal the lien itself.

The Second Restatement supports this common-sense method of measuring the damages attributable to the conversion of a document. Restatement Torts, 2d, § 242, comment c, states: "Where a negotiable instrument is converted, the measure of the converter's liability is presumed to be the face amount of the instrument." See *Aroma Wines*, 497 Mich at 358-359 ("[C]onversion 'to the other person's own use' requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interest[.]"). The "property" converted here, if the tort applies at all, was the money obtained from the sale. I would remand for a recalculation of damages based on that principle.[8]


/s/ Elizabeth L. Gleicher

---

[8] I concur with the majority's resolution of the remaining issues presented in this appeal.